### THE WILLIAM J. RIDDLE.

**Petition of UNITED STATES.**

United States District Court
S. D. New York.
Jan. 24, 1952.

Irving H. Saypol, U. S. Atty., Southern Dist. of N. Y., New York City (Edward L. Smith and Ruth Kearney, Attys., Dept. of Justice, New York City, of counsel), for petitioner.

Kirlin, Campbell & Keating, New York City (Robert S. Erskine and John F. Gerity, New York City, of counsel), for United States Lines, as owner of S. S. American Farmer, claimant.

Dow & Symmers, New York City (John Sheneman, New York City, of counsel), for Royal Ins. Co. et al., claimants.

Bigham, Englar, Jones & Houston, New York City (Charles Van Hagen, Jr., New York City, of counsel), for Home Ins. Co. et al., claimants.

S. H. KAUFMAN, District Judge.

The United States, the owner of the S. S. William J. Riddle, petitions for exoneration from, or limitation of, liability pursuant to 46 U.S.C.A. § 183. This proceeding arises out of a collision between the Riddle and the S. S. American Farmer, owned by the United States Lines. Claimants, in addition to the United States Lines, include insurers who have been subrogated to the claims of owners of cargo carried by the Farmer.

The Riddle is a four hatch Liberty ship 441 feet, 6 inches in length. On the voyage on which the collision occurred, it had a mean draft of 15.08 feet. The Farmer is a C–2 type Liberty ship 459 feet, 1 inch long with a draft of 27 feet, 10 inches.

On the evening of July 31, 1946, both vessels were proceeding on Track C of the Atlantic Ocean, 650 to 700 miles west of the British Isles. The Riddle was traveling westbound, full speed ahead, which was approximately 9½ to 10 knots. The Farmer, eastbound, was also proceeding at full speed ahead, or 16 knots. The ships were approaching each other on courses that were almost parallel; the Riddle steering 262° true, the Farmer 81° true.

The sky was overcast and a moderate wind of about force 3 was blowing from the southwest. The vessels sighted each other at approximately the same time, i. e., 9:54 P. M. Farmer time and about 11:20 P. M. Riddle time. The time discrepancy is attributable to the different time zones in which the vessels were traveling. Five or six minutes after the ships sighted each other, the Riddle's bow crashed into the Farmer's port side forward of the superstructure, between No. 1 and No. 2 holds. The impact opened a large hole in the side of the Farmer and both holds were flooded when the bulkhead between them was carried away. Within half an hour the Farmer was abandoned. Her passengers and crew were taken aboard the Riddle and were transferred, the next morning, to another ship bound for the United States. Contrary to expectations, the Farmer remained afloat and was brought to England, where salvage was awarded.[1]

There is no dispute that just before the vessels collided the Riddle turned hard left and the Farmer hard right. As to almost all the other facts material to the issues here involved there is entire disagreement. The Riddle contends that the two ships were approaching each other in a starboard to starboard passing situation, when the Farmer suddenly swerved hard right directly across the path of the Riddle. The Farmer contends that the vessels were approaching in a port to port passing situation and that the Riddle suddenly swung hard left into the path of the Farmer.

According to the testimony of the officers and crew of the Riddle, visibility had been poor from 8 P. M. on, due to mist and patches of fog, but improved somewhat between 11:10 and 11:15 P. M. Captain Brinson then left the bridge of the Riddle and went to the room containing the master gyro-compass. According to his testimony, he wished to determine whether or not a discrepancy previously noticed in the readings of the master gyro-compass and the repeater compasses on the bridge had recurred. A check was made with the aid of the Third Officer, Oehrlein, who remained on the bridge and communicated

1. The American Farmer, 80 Lloyd's List L.R. 672 (Adm.Div.1947).

with Brinson by telephone. This check was completed in three or four minutes, at which time the Third Officer came to the door of the room and told Brinson that a single white light had been sighted. They immediately proceeded toward the bridge, where Brinson observed a light bearing to starboard which he estimated was about 13° on the Riddle's starboard bow and 2½ to 3 miles away. This light was broadening on the starboard bow when a sudden rift in the fog bank revealed a second white light below and to the right of the first one. The lights continued to broaden on the starboard bow and the degree of separation between them kept increasing. A few seconds later, a green light appeared. From these observations, Brinson concluded that the vessels were in a starboard to starboard passing situation.

Captain Brinson testified that when the lights had broadened to approximately 18° off the starboard bow, the Riddle sounded a prolonged blast, not to signal a course change, but as a fog signal, and then altered the course of the Riddle 5° to port. Another prolonged blast was sounded by the Riddle, according to Brinson, and then the white lights of the other vessel suddenly closed up and, in addition to the green light, a white light became visible, indicating that the approaching ship was headed directly for the Riddle. Brinson ordered the helmsman to turn hard left and after swinging to port for about a minute, the Riddle's bow struck the Farmer. This occurred about 11:26 P. M., Riddle time.

The testimony given by the witnesses for the American Farmer contradicts the testimony of the Riddle on almost all the material issues. Brown, the Farmer's Third Officer, who was on watch, testified that visibility was good when, at 9:54 P. M., Farmer time, he observed two dim white lights approximately half a point on the port bow. The lights were not in line vertically but were separated with the lower light to the left of the upper. Upon looking through his binoculars Brown observed the red port light of the vessel which later proved to be the Riddle. There was a constant broadening of the Riddle's lights on the port bow. These observations led to the conclusion that the two ships were not approaching headon, but were in a port to port passing situation. As the distance between the vessels decreased, Brown estimated that they would be 500 feet apart when they passed each other. With the intention of increasing this passing distance, Brown ordered the Farmer's course altered 5° to starboard. The ships were, at that time, a mile to a mile and one-half apart. No whistle was sounded to signal this course change. It was believed by Brown that the 5° turn to starboard would be sufficient to insure that the passing distance between the vessels would be "upward of three ship lengths", which would be about 1,300 feet.

Following the course change, the lights of the Riddle kept broadening until they reached approximately 4 points (45°) on the Farmer's port bow. The ships were then about a half mile apart. A minute after the Farmer made its 5° turn to starboard, the Riddle suddenly made a rapid turn to its own left into the path of the Farmer. Brown thereupon ordered the Farmer turned hard right in an endeavor to put her on a heading parallel to the Riddle's. A half minute later, after the Farmer had started turning, Brown ordered the engines stopped. Thirty seconds later, at approximately 10 P. M., Farmer time, the two ships collided.

Brown's testimony has been corroborated by three members of the Farmer's crew with respect to matters observed by them immediately preceding the collision.

Certain facts can be considered as having been established. The Riddle failed to signal its turn to port just before the collision, and its engines were neither stopped nor reversed until after the collision. Her engine room was not put on "standby" at any time material to the accident. The Farmer's whistle was not blown at any time material to the accident.

The two accounts of the accident are irreconcilable. The ships were approaching each other either starboard to starboard, as the Riddle contends, or port to port, as the Farmer contends. In the final analysis, the resolution of this issue and the sub-

sidiary issues of fact must hinge. upon the credibility of the witnesses, since, save for the evidence offered by the Riddle dealing with the angle of impact, which will be discussed later, and the testimony concerning the headings of the Farmer which has been corroborated by her automatic course recorder (the Riddle; was not so equipped), the accounts of the collision are based entirely on testimonial evidence.

■ A witness's demeanor on the stand is an element of importance in the solution of the always difficult problem of determining the truthfulness of his testimony. The demeanor of a witness is always assumed to be in evidence. 3 Wigmore, Evidence, § 946 (3d ed. 1940). Brown, the watch officer of the Farmer, judging by his conduct on the witness stand, appeared to be telling the truth. A contrary impression was engendered by the demeanor of the Riddle's officers. This conclusion receives strong support from the inferences to be drawn from unexplained inconsistencies in the story told by the Riddle's officers. A few examples will suffice to indicate the unreliability of their testimony. Brinson, the Riddle's master, stated that continuous foggy weather prevailed during the night of July 31; that there were low fog banks which he termed "the most treacherous fog in the world". If the sea was enveloped in fog, it seems rather strange that during the entire 8 P. M. watch up to the collision, the Riddle's engines were operating at normal full speed ahead; that her watch engineer had not been given a "standby" signal; and that the lookout had been posted on the flying bridge. It was admitted by Captain Brinson that it is customary to reduce speed in a fog and to put the engine room on "standby", and that it would be extremely difficult to hear a fog signal on the flying bridge because of the noise made by the wind whistling through the rigging. Furthermore, petitioner makes no point or criticism of the fact that the Farmer was not sounding fog signals. Brinson and Oehrlein testified that visibility was limited to 2½ to 3 miles, yet on the night of

the collision they thought the Farmer's lights were first sighted at a distance of 5 miles. In testimony given to the Coast Guard in 1946, Brinson claimed the visibility was four miles. In court, Brinson stated he was unable to see the second white light of the Farmer until a minute or so after the first light was seen, because the second light had been obscured by fog. He told the Coast Guard one week after the collision that "probably at first they were more in line, which was the reason I could see only one light".

In his statement to the Coast Guard, Brinson estimated that the angle of collision between the starboard side of the Riddle and the port side of the Farmer was about 30°. On the stand he thought the angle was about 40° between the *port sides* of the two vessels—a difference of 110°!

The testimony of Oehrlein appears to have been tailored to conform to the pattern set by Brinson and is entitled to very little weight.

■ On the basis of the credibility of the witnesses, the conclusion is inescapable that the Farmer's version of the accident is the one which must be accepted.

Petitioner has placed great reliance upon what may be termed "angle of collision" evidence to support the theory that the ships were approaching each other starboard to starboard. It contends, in substance, that the correctness of the Riddle's version of the accident is clearly demonstrable by simple mathematical computation. Given such factors as angle of collision, determined from the nature and extent of the wound inflicted in the side of the Farmer; the turning circles of the vessels; the courses on which they were proceeding;[2] the draft markings; and the conditions of wind and sea, petitioner argues that the relative positions of the vessels immediately preceding the collision is clearly established, and Brinson's version of the events is corroborated. This attempt to fix the relative positions of the vessels just before the collision is founded upon an assumed angle of impact of 66°,

2. Because of an error in its gyro-compass, the actual course of the Riddle just prior to the collision is not known.

that being the angle according to a report offered in evidence by petitioner of a marine surveyor who inspected the collision damage. While there is serious doubt as to the admissibility of this report under 28 U.S.C. § 1732, its persuasive power, if admitted, would not be very great in the light of the eyewitness testimony given by Brown and the crewmen of the Farmer with respect to the angle of collision. Further, even though the angle of impact were capable of precise determination, the attempt to plot from this the relative positions of the ships prior to their sudden turns, would be fraught with insuperable difficulties. There would be too many unknowns and too many variables in the equation.

■ The Farmer's version of the accident having been accepted, it follows that the two ships were approaching each other in a port to port passing situation on courses slightly divergent. If these courses had been maintained, or if any course change had been to starboard, the vessels would have passed each other at a safe distance. The accident resulted from a sudden, and unexplained, turn to port by the Riddle, which brought her directly into the path of the Farmer when the ships were less than a half mile apart. A possible inference to be drawn from the evidence is that Brinson's eyes were not yet adjusted to the darkness when he arrived on the bridge after having left the gyro-compass room, and this temporary "blindness" may have led him to misjudge the relative positions of the two ships. He admitted that "a pretty small interval of time" elapsed between his receipt of the first report and his order to steer hard left. Another possible explanation is that Brinson ordered a turn to starboard, and that the helmsman became confused when he saw the Farmer looming out of the night and turned hard left instead. Whatever may be the explanation for the Riddle's sudden turn to port, there is no doubt that it constituted faulty navigation. The S. S. Bylayl, D.C. S.D.N.Y., 1943, 49 F.Supp. 439, affirmed, Pocahontas S. S. Co. v. The Vacuum, 2 Cir., 1943, 139 F.2d 348. There is nothing in the record from which it may be in-

ferred that this negligence was within the knowledge or privity of the owner of the Riddle and, therefore, the petition for limitation of liability must be granted.

The fault of the Riddle having been established, it must now be determined whether or not fault on the part of the Farmer contributed to the accident. Petitioner raises various grounds to support a finding that the Farmer was at fault. It is contended that the failure of the Farmer to signal her starboard turn was a statutory fault; that the Farmer's men were inattentive; that she failed to take decisive rudder action; that she failed to stop and reverse her engines; and that she was not in the charge of a competent watch officer.

■■ While it is apparent that the failure of the Farmer to signal her course change to starboard constituted a statutory fault, see 33 U.S.C.A. § 113, the evidence does not disclose that this fault contributed to the accident. It has been found that the vessels were approaching each other port to port. The 5° course change in no way altered the port to port situation as far as the Riddle was concerned. It merely increased the distance by which the vessels would pass port to port. It is evident also that there was no necessity for reliance by the Riddle upon a whistle signal, since the lights of the Farmer were clearly visible to the Riddle. Though a presumption of contributory fault arises when a statutory rule designed to prevent collision has been violated, such presumption is dispelled by proof that such fault not only did not cause the collision, but that it could not have done so. United States v. The Adrastus, 2 Cir., 1951, 190 F.2d 883; The Pennsylvania, 1873, 19 Wall. 125, 22 L.Ed. 148. The Farmer has sustained this burden. See National Bulk Carriers, Inc. v. United States, 2 Cir., 1950, 183 F.2d 405, 409.

■ There is no foundation for petitioner's charge that the Farmer's watch officer and lookout were inattentive. Nothing in the evidence suggests that the watch officer could have, or should have, detected sooner than he did that the Riddle was heading toward the Farmer. Nor can it be said that the lookout was negligent for not report-

ing every variation in the bearing of the Riddle's lights. Having originally reported the presence of the Riddle, the lookout could assume that the watch officer was keeping her under close observation and was aware of any change in her course.

■ There is a lack of substance to the argument that the Farmer failed to take decisive rudder action. Before the Farmer made its 5° turn, two minutes prior to the collision, the ships were on slightly divergent courses. If the Riddle had remained on its course, the ships would have passed port to port 500 feet apart. The altering of the course 5° to starboard would have increased the lateral passing distance to approximately 1,300 feet, a sufficient passing distance under the weather conditions then prevailing. The Sidney M. Hauptman, 2 Cir., 1929, 34 F.2d 622, cited by petitioner to support its argument that decisive rudder action was not taken, is not in point. That case involved a situation in which vessels close to each other were meeting head on. It is within the realm of possibility that more drastic action than a 5° turn to starboard might have more clearly signified to those aboard the Riddle that a port to port passing situation was presented, but the officer then in charge of the Farmer cannot be blamed for relying on the assumption that the Riddle was under the command of a competent navigator who could correctly interpret that a port to port passing situation existed. The watch officer had no reason to anticipate the Riddle's sudden swing into the Farmer's path. "A vessel may therefore assume, in the beginning, that other vessels will be navigated lawfully and prudently and may determine her own course accordingly." Griffin, Collision 29 (1949). See The Victory, 1897, 168 U.S. 410, 429, 18 S.Ct. 149, 42 L.Ed. 519.

■ The failure of Brown to stop and reverse the engines cannot be termed faulty navigation. There is nothing in the evidence to show that, had such action been taken, the collision would have been avoided. The Farmer had one minute, after the Riddle started her turn, in which to take counter action. Her hard right turn was made in an effort to parallel the Riddle's heading and, in order to accelerate her turn, the engines were kept at full speed ahead. This would not appear to be an example of faulty navigation, but even if it were so judged, it clearly would come within the doctrine of error *in extremis*. See The Bylayl, 49 F.Supp. at pages 442–443; Petition of Socony Vacuum Transp. Co., Ltd., D.C.S.D.N.Y., 1950, 93 F.Supp. 718, 727.

■ The charge of incompetency directed at Brown has not been established. He received his training at Fort Trumbull, New London, a Government school, and received his third mate's license on October 30, 1945, nine months before the accident. However, inexperience is not synonymous with incompetence. His conduct on the night of the accident gives ample support to the opinion of his captain that he was a competent officer. His order altering the Farmer's course 5° to starboard two minutes before the collision was a wise precautionary measure, even though it proved ineffective because of the Riddle's subsequent negligence. It should be noted that, unlike the more experienced captain of the Riddle, he did not forget to order the Farmer's engines stopped when the ships were swinging together.

The evidence is clear that there was no contributory fault by the Farmer.

All issues of damages, including the question of whether there was adequate justification for the abandonment of the Farmer, will be referred to a commissioner.

In addition to the findings of fact and conclusions of law contained herein, the following formal findings and conclusions are made in accordance with Admiralty Rule 46½, 28 U.S.C.A.:

### Findings of Fact

1. In the late evening of July 31, 1946. on Track C of the Atlantic Ocean, 650 to 700 miles west of the British Isles, a collision occurred between the S. S. William J. Riddle and the S. S. American Farmer. The bow of the Riddle crashed into the Farmer's port side forward of the super-

structure, between No. 1 and No. 2 holds, opening a large hole in the Farmer's side.

2. At the time of the collision the sky was overcast. A moderate wind of about force 3 was blowing from the southwest. Visibility was good.

3. The Riddle was westbound and traveling at full speed ahead or 9½ to 10 knots. The Farmer was eastbound and proceeding at full speed ahead or 16 knots.

4. The vessels were approaching each other in a port to port passing situation, on courses slightly divergent, and would have passed each other at a distance of 500 feet if there had been no course change. The exact course of the Riddle is not known because of an error in its gyro-compass.

5. When the vessels were a mile to a mile and one-half apart, the Farmer altered her course 5° to starboard. No whistle was sounded to signal this course change.

6. A minute after the Farmer made its 5° turn to starboard, the Riddle made a rapid turn to port and swerved into the path of the Farmer. The Farmer then turned hard right in an attempt to take a heading parallel to that of the Riddle. A half minute later the Farmer's engines were stopped and thirty seconds after that the ships collided. The Riddle's engines were neither stopped nor reversed until after the collision. The Riddle's engine room was not put on standby at any time material to the accident. The Farmer's whistle was not blown at any time material to the accident. The Riddle failed to signal its turn to port made just prior to the collision.

## Conclusions of Law

1. The sudden turn of the S. S. William J. Riddle into the path of the S. S. American Farmer was due to the Riddle's faulty navigation and was the cause of the collision.

2. The fault of the Riddle was not within the knowledge or privity of its owner, and its petition to limit liability is therefore granted.

3. There was no contributory fault on the part of the Farmer.

4. The claimants are entitled to a decree.

If either party deems further findings and conclusions necessary, they may be submitted in accordance with this opinion. Submit decree in accordance herewith.