**Derek LAMB, Plaintiff-Appellant,**

**v.**

**GLOBE SEAWAYS, INC., and Maritime Overseas Corporation, Defendants-Appellees.**

No. 398, Docket 73–2692.

United States Court of Appeals, Second Circuit.

Argued Jan. 31, 1975.

Decided May 28, 1975.

Derek Lamb, pro se.

Joseph T. Stearns, New York City (Haight, Gardner, Poor & Havens, New York City, on the brief), for defendants-appellees.

Before MEDINA, OAKES and GURFEIN, Circuit Judges.

MEDINA, Circuit Judge:

In this action by a seaman under the Jones Act, 46 U.S.C., Sections 688 et seq., to recover damages for an injury to his back, alleged to have been sustained aboard the Overseas Anchorage when his bunk collapsed due to a defective right front leg on December 3, 1972 at Albany, New York, the jury returned a general verdict for the defendants, shipowners, and the seaman appeals.

Following his usual practice in admiralty and Jones Act cases involving seamen Judge MacMahon conducted a pretrial hearing on July 23, 1973 and instructed counsel to take Lamb's deposition and also the depositions of any other witnesses who might be aboard ship on the high seas at the time the case was reached for trial. Counsel for the seaman did nothing about this but counsel for the shipowners took Lamb's deposition on August 14, 1973. In response to questions by counsel for the shipowners Lamb testified to his version of how he was injured and this testimony if believed furnished a proper basis for the submission of the case to the jury on the two issues of negligence and unseaworthiness. Prior to the commencement of the trial on October 10, 1973, counsel for Lamb made a motion for a continuance of several months because Lamb was at sea.

■ We are all agreed that the denial of the motion for a continuance was not an abuse of the trial judge's discretion. All the parties knew of the possibility that Lamb might be absent and the trial judge had provided an alternative method of perpetuating Lamb's testimony for use at the trial. This Circuit has consistently upheld the practice of denying trial continuances in cases in which a party or a witness was absent from the trial. See, Davis v. United Fruit Company, 402 F.2d 328 (1968), cert. denied, 393 U.S. 1085, 89 S.Ct. 869, 21 L.Ed.2d 777 (1969). See, also, Michelsen v. Moore-McCormack Lines, Inc., 429 F.2d 394 (1970); Sacharow v. Vogel, 428 F.2d 1389 (1970); Winston v. Prudential Lines, Inc., 415 F.2d 619 (1969), cert. denied, 397 U.S. 918, 90 S.Ct. 926, 25 L.Ed.2d 99 (1970); Vitarelle v. Long Island Rail Road Company, 415 F.2d 302 (1969). This line of cases is applicable *a fortiori* to situations arising since the establishment of the new assignment system in the Southern District of New York on July 1, 1972, by which substantial numbers of particular cases are assigned to each of the trial judges and each judge is given what virtually amounts to complete control of his calendar in these cases. He passes upon all the motions, he supervises all the discovery and pre-trial proceedings and he decides when the cases are to be tried.

Nor do we find any miscarriage of justice in this case or the slightest hint or scintilla of evidence that the proceed-

ings were expedited "at the expense of justice." On the contrary, as stated by Judge MacMahon in his memorandum denying the motion for post-trial relief: "Plainly the jury resolved the issues of fact against the plaintiff on unassailable evidence."

To begin with, Lamb's version of the occurrence is inherently improbable. If his bunk collapsed it would simply fall to the deck with Lamb under the bedclothes. Instead, he says he was "thrown out on the deck." He "landed with a thud," had a bump on his head and was perhaps for a time unconscious. The medical report at the Albany hospital reports his pulse at 120, far above normal, "denies alcohol for two months" and shakiness "not due to back injury." Even Lamb's expert witness Dr. Sherman, who had not previously been informed of Lamb's problems with alcohol, admitted that these statements in the medical report were significant and that, as the violence and thrashing about that often accompanied delirium tremens and withdrawal symptoms within 4 or 5 days after the last drink of alcohol, made it important in evaluating Lamb's condition in the Albany hospital "to consider this prior history of alcoholism." So the objection to this testimony was properly overruled and hospital record after hospital record was produced showing heavy drinking and chronic alcoholism since at least 1962, and many attacks of delirium tremens.

The incident aboard the Overseas Anchorage occurred on December 3, 1972, and, a little over one month later, as an outpatient at the Marine Hospital in Staten Island, New York, Lamb arrived at the clinic ready for "treatment" on January 9, 1973, "quite inebriated" and "tremulous."

Not only does the record reveal Lamb as a chronic alcoholic, he is also revealed as a chronic falsifier of the evidence. Whenever he thought he could get away with it he categorically denied matters unfavorable to his side of the case, and these denials were proved by documentary evidence to be false. He denied that he had suffered any prior back injury and he said the same thing to his expert medical witness Dr. Sherman, but the New Orleans hospital records of August 31, 1966 showed that he had been given a terrific beating by several men, showed extensive superficial abrasions on his back and X-rays were taken. This injury was to the part of the back above the sacrum and below the lumbosacral joint. He denied that he was ever discharged from a vessel for drunkenness but the documentary evidence contradicted him. There was much more of this.

It seems to be thought that there should be a new trial because the trial judge did not back up his direction that Lamb's deposition be taken for use on the trial if he was absent at sea by some general admonition to counsel for defendants not to take advantage of this. But the subject was not even mentioned at the trial or in the briefs or on the oral argument of the appeal and we think what was said by Judge MacMahon when the subject of Lamb's absence was mentioned in the opening of defense counsel to the jury was a quite sufficient indication that counsel was not to discuss the reasons Lamb went to sea and did not testify. All counsel had done was to mention the fact that Lamb left the Port of New York on October 3 and that he should have been made aware of the fact that his case was coming up for trial soon. Judge MacMahon was on the alert. It was he who had directed the taking of the deposition and he was not going to permit counsel to put the blame on Lamb or anyone else. So, he said:

The Court: I'm sorry. I hesitate to interrupt you, but I don't want you to misrepresent things. We hold pretrial conferences in these cases and the pretrial conference in this case was held on July 23, 1973, last summer. At that time, of course, the Court was fully aware that the plaintiff in this action, Mr. Lamb, was a seaman. This Court has many cases on trial. It cannot set definite times for trials in civil

cases, so counsel were instructed at that time to take the deposition of Mr. Lamb to protect against the fact that he might be out to sea when this trial was reached.

They were told that the case would proceed to trial whether or not Mr. Lamb was at sea, and if there were any other witnesses who could not be here to be sure to take their deposition.

That's the situation.

You may proceed.

That the reading of the deposition and the failure of Lamb to testify in open court played no part in the jury's deliberations is, to some extent, indicated by the fact that the jury asked for the photographs of the bunk, the Albany Memorial Hospital records and the Public Health Hospital reports of the Marine Hospital in Staten Island, and they reached their verdict within an hour thereafter.

Affirmed.

OAKES, Circuit Judge (dissenting):

I respectfully dissent.

On my reading of the whole record an injustice has been done and Mr. Lamb is, I think, entitled to a new trial.

If each potential question is taken individually, the views reached by the majority are by no means unreasonable. Viewed as a whole, however, the trial contained a complex of events that resulted in unfairness to this appellant pro se. This complex includes the following:

1. Lamb's claim as to the accident is entirely plausible. His metal bunk was supported by one wooden leg at the right foot of the bed. That wooden leg, a sawed off broom handle, although drilled for two bolts, was bolted with only one. The bunk was, then, like a collapsible card table with one leg on a free swivel. Almost everyone in the course of a night's sleep does some moving about. Thus, it strikes me as entirely reasonable that the bunk collapsed. One would necessarily hit the floor with some force. There was no evidence produced by the shipowner to refute the appellant's testimony as to how his injury occurred. Photographs of the bunk clearly established its condition as claimed by Mr. Lamb.

2. Appellant was at sea at trial. His testimony, therefore, was presented only by way of deposition, a deposition taken not by his own counsel but at the instance of defense counsel. Thus his testimony was presented to the jury as I have read it in the transcript in its least favorable light. As Judge Learned Hand said in Napier v. Bossard, 102 F.2d 467, 468–69 (2d Cir. 1939), "The deposition has always been, and still is, treated as a substitute, a second-best, not to be used when the original is at hand" for it deprives all concerned "of the advantage of having the witness before the jury." *See also* Arnstein v. Porter, 154 F.2d 464, 470 (2d Cir. 1946). In Salsman v. Witt, 466 F.2d 76, 79 (10th Cir. 1972), the Tenth Circuit referred to "the long-established principle that testimony by deposition is less desirable than oral testimony and should ordinarily be used as a substitute only if the witness be unavailable to testify in person."[1]

---

1. All this is true, of course, because "the demeanor of witnesses is recognized as a highly useful, even if not an infallible, method of ascertaining the truth and accuracy of their narratives." Arnstein v. Porter, 154 F.2d 464, 470 (2d Cir. 1946). A witness's demeanor on the stand "is an element of importance in the solution of the always difficult problem of determining the truthfulness of his testimony." The William J. Riddle, 102 F.Supp. 884, 887 (S.D.N.Y.), aff'd, 200 F.2d 608 (2d Cir. 1952).

This is expressly recognized in the Federal Rules of Civil Procedure, since Rule 32(a)(3)(E) refers directly "to the importance of presenting the testimony of witnesses orally in open court." Rule 43(a) says, "In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by these rules." *See also* 8 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2142 (1970).

No one who has ever tried personal injuries cases or had them tried before him can fail to be aware of the proposition that with a jury the live testimony of the injured party is apt to be of crucial importance.

3. Judge MacMahon's practice to require in seamen's cases that the plaintiff have his deposition taken so that the case may be tried in his absence has doubtless helped him to be one of the most expeditious of federal judges in a district that is one of the busiest in the country. For this he is entitled to due credit. But even though that practice has been supported by decisions of this court, e. g., Davis v. United Fruit Co., 402 F.2d 328 (2d Cir. 1968), cert. denied, 393 U.S. 1085, 89 S.Ct. 869, 21 L.Ed.2d 777 (1969), it can be overdone; in *Davis* the court admonished that "we realize that a court must not let its zeal for a tidy calendar overcome its duty to do justice." *Id.* at 331. This case, which was filed on January 17, 1973, was first listed for trial in the New York Law Journal on October 1, 1973, as the ninth case on Judge MacMahon's trial calendar. On that date the appellant was in New York aboard the SS Sealand Finance, which sailed two days later, October 3, 1973. The appellees argue that "in view of the known vigor of the trial judge, if the presence of the plaintiff at trial was thought desirable, arrangement, we assume, could easily have been made for him to have been available. . . ." (Appellees' Brief at 6.) It affirmatively appears from the papers in the record, however, that the appellant's attorney, Sheldon Tabak, Esq., first heard that the matter was ready to proceed to trial on October 5, 1973, at which time he was advised by the chambers of Judge MacMahon that the matter would be tried on Wednesday, October 10, 1973. He immediately moved for a continu-

ance, pointing out that the appellant would be at sea for two or two and a half months, but his motion was denied. On the oral argument of this appeal it also appeared from assertions by appellant that neither he nor his counsel were aware of the notice on October 1 in the New York Law Journal and that the voyage he made on October 3 was taken out of dire financial necessity.

4. The majority refers to Mr. Lamb's history of chronic and acute alcoholism, evidence as to which was the principal defense made below. There was not a shred of evidence that Lamb had been drinking immediately prior to the accident on the Overseas Anchorage or that he was in the stage of withdrawal at which delirium tremens symptoms might appear; that was also no evidence that he had any such symptoms at or about the time of the accident. I was unaware that a history of alcoholism disentitled an injured person to recovery.

5. The majority refers to Mr. Lamb in language better reserved, I think, for common criminals as a "chronic falsifier of the evidence." The superficial abrasions to his back after the August, 1966, beating he suffered were only a part of his injuries, which included contusions about both eyes, and injuries to his ribs, hand and head. For him not to recall the back injury is not that surprising; it hardly makes him a "chronic falsifier."

6. The case was argued to the jury with defense counsel taking every advantage of Lamb's absence at sea at the time of trial.[2] Where the trial is allowed to proceed with a party legitimately and necessarily absent because of the nature of his work, I think a court unwilling to grant any continuance whatsoever must take affirmative measures to prevent the opposing party from taking unfair advantage of the situation. Here appellees' counsel was allowed almost com-

---

2. In the opening statement counsel for appellees had pointed out appellant's absence. He said, referring to Mr. Lamb,

He is at sea now. He went to sea, as far as I can determine, and I suppose there will be

testimony from the plaintiff's side to this effect, that he left the port of New York aboard a ship October 3d, 1973. That's a short time ago. That's at a time when Mr. Lamb was aware or should have been aware, should have been made aware, that

plete freedom both in his opening statement and closing argument to argue at length the possible implications of Mr. Lamb's failure to appear in court.

I cannot help but add that I was impressed by Mr. Lamb's manner, demeanor and obvious sincerity on oral argument of his appeal pro se. Had he been able to appear in court with the help of a little bit more notice of trial, or one discretionary exercise of the power of the trial court to grant one little continuance in this ten-month-new case, a different result might well have obtained. Failing his personal appearance, had his deposition been taken by his own counsel, there might have been a difference.[3] In any event, opposing counsel should not have been permitted to argue his absence.

Under all of these circumstances, coupled with the inherent plausability of Mr. Lamb's version of the accident, I think he is entitled to a new trial. The events of the trial had, in a word, a synergistic effect, ignored by the majority, which resulted in a denial of justice.

his case was coming up for trial very soon. He did not come here to testify before you. I think you are going to be disadvantaged—

At this point Judge MacMahon did interrupt to say that he did not want counsel to misrepresent things, that the pretrial conference was held on July 23, 1973, that the court was aware that the plaintiff was a seaman and counsel were instructed to take the deposition to protect against the fact that he might be out to sea when the trial was reached, and that counsel were told that the case would proceed to trial whether or not Mr. Lamb was at sea. But this was hardly an admonition about the line of argument; at best it only reemphasized plaintiff's absence. Counsel for the appellees continued,

In any event for whatever reason there may be for the absence of Mr. Lamb you are going to lose something. You are going to lose something of the flavor of his testimony because you do not have an opportunity to observe his demeanor at the time these questions were asked.

At the very beginning of the closing argument appellees' counsel said,

The situation is we have heard it—nobody was there except for two men who are not here in court, Mr. Lamb who said he had the accident, and a witness . . . .

He then continued,

The plaintiff is not here as well. There has been testimony that he is now presently on the SS Sealand Finance, that he joined that ship on September 21, 1973, overseas, the ship came to New York. He was here in New York until it sailed the afternoon of October 3rd, 1973.

He continued,

Dr. Merino testified that hyperpsychomotor activity was one symptom of alcoholic withdrawal, where people in this condition thrash around in bed. As I say, I was not there; Mr. Lamb, who was there, did not testify in person.

True, none of these statements were objected to. But the only references that the court made were not to the effect that the plaintiff should not be disadvantaged because of his being away at sea but that all of the parties had ample warning that Judge MacMahon did not grant continuances for seamen merely because they were away at sea. I think that counsel for the appellees under all the circumstances was unfairly permitted to leave the impression in the jury's mind that somehow they, the appellees, had been injured by the application of Judge MacMahon's strict rules against continuance.

3. What a perfect opportunity and situation for the use of a videotape deposition! How to improve the administration of justice while at the same time preserving the integrity of the judicial process by insuring demeanor evidence for the triers of fact! United States v. LaFatch, 382 F.Supp. 630 (N.D. Ohio 1974) (testimony of hospitalized key witness presented on videotape where trial would otherwise have been delayed); Carson v. Burlington Northern, Inc., 52 F.R.D. 492 (D.Neb.1971) (videotaped deposition used at trial). A substantial number of unreported cases involving videotape experiments are collected in the compendious footnotes of Doret, Trial by Videotape—Can Justice Be Seen to be Done?, 47 Temp.L.Q. 228 (1974). See generally Asburke, Introducing Videotape to the Courts, Journal of the American Judicature Society (Apr.1973); Kennelly, The Practical Uses of Trialvision and Depovision (Callaghan & Co. 1972); Lester, Heifner & Manning, Aspects of Claims Handling by Videotape Recordings, 29 Fed.Ins.C.Q. 14 (Summer 1970); Madden, Illinois Pioneers Videotaping of Trials, 55 A.B.A.J. 457 (1969); Stevens, Videotape: Its Admissibility in Evidence and Other Uses, 5 Ga.S.B.J. 393 (Feb. 1963); Note, Videotape Trials: Legal and Practical Implications, 9 Colum.J. of L. and Soc. Prob. 363 (1973).