**James M. MORRISSEY, Plaintiff,**

v.

**NATIONAL MARITIME UNION et al., Defendants.**

**No. 72 Civ. 2363.**

United States District Court, S. D. New York.

July 10, 1975.

Duer & Taylor, New York City, for plaintiff; Arthur E. McInerney, John S. Chapman, Jr., New York City, of counsel.

F. V. Mina, New York City, for National Maritime Union, Curran, Wall and Snow.

Hart & Hume, New York City, for Sovel and Freedman; Joseph A. Bergadano, New York City, of counsel.

OPINION

WARD, District Judge.

James M. Morrissey ("Morrissey"), a member of the National Maritime Union of America ("the Union"), brought this action in June, 1972, alleging violations of his rights under 29 U.S.C. §

411(a)(2) and (5) (hereinafter referred to as the Landrum-Griffin Act), and malicious prosecution, on the part of certain Union officers and employees and the Union itself. After a four day trial in April, 1975, the jury returned a verdict for plaintiff, awarding a total of $333,500 in compensatory and punitive damages against defendants Joseph Curran ("Curran"), Shannon J. Wall ("Wall"), Charles Snow ("Snow"), and the Union itself.[1]

Defendants move pursuant to Rules 50 and 59, Fed.R.Civ.P., for an order setting aside the verdict against them, and for judgment in their favor dismissing the complaint, or in the alternative, for a new trial. For the reasons set forth below, the motions are denied, except that the motion to set aside the verdict against the defendant Union and enter judgment in its favor is granted.

The undisputed events which form the basis of Morrissey's allegations, briefly, are these. On July 1, 1971, Morrissey who had for years opposed the established Union leadership, was in the Union Hall in New York City, distributing pamphlets contesting Curran's policies as he had on several occasions during the preceding month. Curran was President of the Union, but on that day was in Boca Raton, Florida. The Master-at-Arms, James Nimmo, upon instructions from Snow, the Chief of Security, several times requested Morrissey to cease distributing pamphlets inside the Hall, pointing out to him a notice posted on the bulletin board in the Hall and advising him that his conduct was illegal. The notice, which was undated but was signed by Wall, then the Union's Secretary-Treasurer, read:

It is the established policy of the National Maritime Union that only official union publications may be distributed inside the Hiring Halls or other union offices. No solicitation is permitted inside any union buildings. Any persons attempting to solicit sales or distribute unauthorized literature inside NMU buildings will be asked to discontinue such practice and, in the event they fail to comply with such request, will be required to leave the premises.

When Morrissey persisted in distributing his pamphlets and refused to leave the building, the police were called, as Snow had directed. After a brief meeting with Snow in his office, the police took Morrissey to the Sixth Precinct Station House, where, upon a complaint which Nimmo signed, he was charged with disorderly conduct and criminal trespass. Morrissey was allowed to leave within a short time but was summoned for arraignment July 13, 1971. At the arraignment the charge of disorderly conduct was dropped and the case set for trial on July 20, 1971. The trial judge, after a preliminary hearing at which no testimony was taken, summarily dismissed the charge of criminal trespass, finding no chargeable offense upon any set of facts which the State offered to prove. Counsel for the Union was present at that time.

Morrissey, in this civil action brought pursuant to 29 U.S.C. § 412, claimed that the actions of the Union officials in prohibiting and preventing him from distributing the pamphlets in the Union Hall deprived him of his right under 29 U.S.C. § 411(a)(2) to meet and assemble freely with other Union members and to express his views, arguments and opinions; that their causing his arrest constituted improper disciplinary action in violation of 29 U.S.C. § 411(a)(5); and that the arrest and subsequent attempts to prosecute him constituted the common law tort of malicious prosecution. He sued for both compensatory and punitive damages.

The Court, using a special verdict form, submitted the questions of liability and compensatory and punitive damages on the Landrum-Griffin Act claims

---

1. During the trial plaintiff agreed to the dismissal of all claims against James Nimmo, Abraham E. Freedman, and Charles Sovel.

and the malicious prosecution claim separately to the jury. The jury returned a verdict for plaintiff distributed as follows:

| | | |
|---|---|---|
| Landrum-Griffin Act: Compensatory damages: | | $500 |
| Punitive Damages against the Union: | | $50,000 |
| | against Curran: | $100,000 |
| | against Wall: | $60,000 |
| | against Snow: | $10,000 |
| Malicious Prosecution: Compensatory damages: | | $3,000 |
| Punitive Damages against the Union: | | $50,000 |
| | against Curran: | $25,000 |
| | against Wall: | $15,000 |
| | against Snow: | $20,000 |

Defendants base their motions on the grounds that the verdict is contrary to the weight of the evidence, contrary to the law, so excessive as to shock the conscience, and duplicative, as well as on the ground that the Court made prejudicial errors in its rulings during the trial and in its charge.

■ It is clear that the motion for judgment notwithstanding the verdict on the ground that it is against the weight of the evidence must be denied. The standard on such a motion is the same as the standard for a directed verdict, that is, whether there was evidence from which the jury could have properly found for plaintiff, against whom the motion is made, viewing the evidence most favorable to him and giving him the benefit of all reasonable inferences. 9 Wright and Miller, Federal Practice and Procedure § 2524 (1971); *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970). The Court is of the view that the evidence presented, viewed in this light, was certainly sufficient to permit the case to go to the jury.

■■ The central events of July 1, 1971, testified to largely by plaintiff and Nimmo, and set forth above, were basically undisputed. To defeat plaintiff's Landrum-Griffin Act claims, defendants attempted to show that the notice signed by Wall and posted in the Union Hall, to the effect that Union policy prohibited passing out unauthorized literature, was a valid regulation of conduct which might interfere with the Union's performance of its obligations, or a reasonable rule as to the responsibility of members toward the Union as an institution. 29 U.S.C. § 411(a)(2). In the Court's view, the evidence presented utterly failed to establish this defense. Snow testified by deposition that the members tended to get into arguments which sometimes became fights, and that Morrissey would never back away from a fight, although he did not start fights. Wall testified on the stand that he had signed the notice and caused it to be posted at Snow's request, because passing out literature in the Hall tended to stimulate arguments.

Whether this would be a reasonable basis for adopting a standing rule might have been a question for the jury. However, the Union Constitution, in evidence, clearly states that all policies of the Union and all changes in official Union policy, must be formally approved by the members of the Union. And the transcript of the proceeding before Judge Ringel in New York Criminal Court on July 20, 1971, also in evidence in this action, at which the charge of criminal trespass was dismissed, contains statements made by attorneys for the Union, that the notice in question was never so ratified. The notice itself purports to reflect a national policy. There is no evidence whatever in the record that the "policy" referred to in

the notice was ever adopted by the Union membership. Accordingly, the Court instructed the jury, on this issue alone, that the notice itself was not duly promulgated by the Union. Wright and Miller, *supra*, § 2425.

■ Proof of a threat of imminent disturbance as a result of Morrissey's conduct on July 1, 1971 might also have defeated his Landrum-Griffin Act claim. However, there was little evidence (other than Curran's hearsay testimony relating his later conversations with Snow) that Morrissey's distributing literature on that date caused or threatened to cause any imminent disruption in the Union Hall. In fact, the preponderance of evidence was to the contrary, creating certainly sufficient question to warrant submission of this issue to the jury.

■ Curran, to defeat Morrissey's Landrum-Griffin Act claim against him, argues that there is no evidence in the record to connect him to the events of July 1, 1971, since he was in Boca Raton, Florida and none of the other participants in Morrissey's arrest and prosecution testified to consulting him concerning it. He himself testified by deposition that he did not know of the fact of the arrest until after it had occurred, when he discussed the events with Snow, the Port Agent, and the Union's counsel. However, records of telephone calls from the Union headquarters to Boca Raton on June 30, 1971 and July 20, 1971, as well as on other dates during those months, were introduced, although there is no direct evidence concerning the identity of the parties to those conversations or their content. Morrissey had distributed pamphlets in the same manner on several occasions during the preceding month, and had been instructed to cease by the Union attorneys.

Curran also testified by deposition that he, as President of the Union, was generally familiar with Union affairs, and while he stated that he did not himself know whether the notice was posted in the Union Hall on July 1, 1971, he did not disclaim knowledge of its existence, or indicate disapproval of the "policy" in any way. Moreover, he stated that he made no effort to have the charges against Morrissey dropped, in the context of statements from which the jury could infer general approval of Snow's action. The inference that Curran was consulted concerning this method of enforcing the "policy" reflected in the notice, and its enforcement in this instance, is not impermissible, and the evidence, though circumstantial, was sufficient to submit to the jury the Landrum-Griffin Act claim against him.

■ Similarly, the Court finds that there was sufficient evidence in the record not only to submit the issues to the jury but also to warrant its conclusion that each of the defendants had participated in the alleged malicious prosecution. The jury was informed of the nature of the offenses of disorderly conduct and criminal trespass, and was instructed without objection (*see* Rule 51, Fed.R.Civ.P.) substantially in accordance with defendants' requests that if a reasonably prudent person in the position of any of the defendants would have been justified in considering Morrissey's actions within those offenses then that defendant had probable cause to initiate or further his arrest and prosecution and the jury could not find against that defendant. 2 N.Y. Pattern Jury Instructions 803 (Judicial Conference of the State of New York, 1968) ("PJI"). The jury was also instructed that to find against any defendant on this claim it must also find that he acted with malice, and was instructed without objection concerning what constitutes malice. The jury is permitted to infer malice from the fact of prosecution without probable cause, *Bradner v. Faulkner*, 93 N.Y. 515 (1883); 2 PJI 808, and from all the circumstances of the case, and was clearly instructed that reliance on advice of counsel could be taken as evidence of lack of malice. 2 PJI 804. There was also some additional testimony, sufficient to contribute to

an inference of animosity, concerning Morrissey's opposition to a pension plan in which these defendants participated. Since this type of judgment is peculiarly within the jury's province, in the Court's view the issue was properly submitted to the jury, and the jury's evident conclusion is not unsupported by the record.

Counsel argues on behalf of both Curran and Wall that they were insufficiently connected with the arrest and subsequent prosecution to be held for malicious prosecution. As the Court ruled at the conclusion of defendants' case, the evidence that both were high ranking officials of the Union and knew of the arrest shortly after it occurred, the telephone calls to Boca Raton, and the subsequent involvement of counsel for the Union in the prosecution of the charges against Morrissey, were sufficient to create issues of fact concerning their initiation or furtherance of the arrest and prosecution which were properly submitted to the jury.

■ Defendants argue as a matter of law that the verdict must be set aside because it is essentially double recovery on a single cause of action. They argue that the case arises from a single injury and a single set of operative facts. The Court considered this question before it submitted the case to the jury, and remains of the view that there are two separate and distinct causes of action here.

■■ In order to prove a violation of 29 U.S.C. § 411(a)(2) it would have been sufficient for plaintiff to show that his right to express his views, arguments and opinions was infringed upon by the Union officials without a validly adopted rule governing conduct which might interfere with its performance of its legal or contractual obligations. *Salzhandler v. Caputo*, 316 F.2d 445 (2d Cir. 1963), *cert. denied*, 375 U. S. 946, 84 S.Ct. 344, 11 L.Ed.2d 275 (1963). Merely his forcible ejection from the Union Hall, which effectively prevented him from expression of his views within the Hall, would have sufficed, without any evidence concerning malice or his being arrested on criminal charges and brought to trial. This is a statutory right, reflecting a legislative determination that Union members should be assured of a right to speak which goes beyond even that which is Constitutionally protected. *Salzhandler v. Caputo, supra.*

■ In order to prove the tort of malicious prosecution, on the other hand, plaintiff was required to establish, in addition to the facts of his arrest and the dismissal of the charges against him, that a reasonably prudent person in defendants' position was not justified in believing his actions to be conduct constituting criminal trespass or disorderly conduct (this whether or not the posted notice was validly adopted), and that defendants acted with malice in initiating or furthering his prosection. *See, e. g., Munoz v. City of New York*, 18 N.Y.2d 6, 271 N.Y.S.2d 645, 218 N.E.2d 527 (1966). This requires substantially different evidence from the alleged Landrum-Griffin Act violation.

In fact, the Court specifically charged the jury on the distinct standard of recovery for compensatory damages in the two claims in several respects. Further, the jury was instructed not to duplicate awards. Significantly, in its award of punitive damages, after inquiring whether it was permitted to allocate recovery among the several defendants, the jury distributed the amounts in quite different proportions among them, reflecting its judgment of their relative culpability on each claim.

Thus, while the case arises from occurrences which are so intertwined that the exercise of the Court's pendent jurisdiction is completely appropriate, there are two separate causes of action here, and the jury clearly awarded two distinct recoveries.

■ Defendants further argue that the verdict must be set aside as a matter of law because the Union cannot be held for punitive damages when the members

have not ratified the acts of their officers and employees. Only now, after trial, they present cases supporting this contention. *Martin v. Curran*, 303 N.Y. 276, 101 N.E.2d 683, aff'g. 273 A.D. 980, 78 N.Y.S.2d 506 (1951); *Gulickson v. Forest*, 290 F.Supp. 457, 469 (E.D.N.Y. 1968). Upon consideration the Court agrees. With respect to the Landrum-Griffin Act claim, the Court charged that the notice was never duly promulgated by the Union; with respect to the claim of malicious prosecution, there was no evidence that the membership ever ratified the acts of the Union officers and employees. The officers' and employees' actions, although taken ostensibly in their official capacity, were beyond the scope of their authority as officers and employees of the Union.

Accordingly, defendants' motion to set aside the verdict and enter judgment in their favor is granted insofar as it relates to the award of punitive damages against the Union.

Defendants ask the Court to set aside the jury's award of punitive damages and order a new trial, because the award is so excessive that it shocks the conscience. They compare the award of $220,000 for the violations of the Landrum-Griffin Act with the maximum fine of $1000 pursuant to 29 U.S.C. § 530 after criminal conviction of such violations, and claim that there is insufficient evidence of malice to support an award of $110,000 in punitive damages for malicious prosecution.

 The size of an award of punitive damages is for the jury to determine, and the jury was properly instructed that it need bear no particular relationship to the actual damages incurred, but is rather designed to have enough impact to punish and deter. *Reynolds v. Pegler*, 123 F.Supp. 36, 38 (S.D.N.Y.1954) (Weinfeld, J.), *aff'd*, 223 F.2d 429 (2d Cir.), *cert. denied*, 350 U.S. 846, 76 S.Ct. 80, 100 L.Ed. 754 (1955); 2 PJI 810. Whether the size of the award is so excessive as to be shocking to the conscience will depend upon

the particular facts of the case, including the whole setting of the trial, the character of the evidence, and the nature of the issues. The Court must exercise its broad discretion in reviewing the size of the award to prevent a miscarriage of justice. 6 A. Moore's Federal Practice ¶ 59.05[3] (1972). In *Roginsky v. Richardson Merrill, Inc.*, 378 F.2d 832 (2d Cir. 1967), upon which defendants heavily rely, the Court set aside an award of $100,000 punitive damages, which it compared to the potential criminal fine of $10,000, largely because the defendant was exposed to a multiplicity of actions with potentially astronomical awards. The Court there determined that the record was lacking in evidence of the degree of culpability, that is reckless or wanton behavior in disregard of plaintiff's rights, which would justify such consequences. *Id.*, at 843 *et seq.*

 In the instant action, by contrast, there is a single plaintiff, with no multiple pending actions, and a record which, in the Court's view, sufficiently established the malice or reckless disregard of plaintiff's rights to support a jury's decision to award punitive damages. Having so determined, the jury was within its province to choose an amount which it considered likely to have the effect of punishing defendants and deterring them or others from such conduct. In the Court's view, the size of the award reflects the value which the jury placed upon Union members' right to express their views, and to be free from malicious prosecution, and reflects as well its judgment concerning what award would sufficiently deter defendants or others in the future. Since a criminal conviction, with a possible prison sentence, carries collateral effects which do not necessarily relate directly to the size of the possible fine, the Court does not consider the jury limited, in a civil action, to an award of punitive damages of comparable size. Moreover, the Court notes that proof of malice or reckless disregard of plaintiff's rights would not have been required to support

a criminal conviction for violation of 29 U.S.C. § 411(a)(5).

Accordingly, the Court declines to order a remittitur or a new trial on the ground that the size of the award is shocking to the conscience.

Defendants strenuously argue that it was an abuse of this Court's discretion to deny a continuance when counsel informed the Court five days before trial that Curran was to be hospitalized for immediate surgery and would be unavailable to testify at trial.

■ The Court has wide discretion to rule on an application for a continuance, to be exercised upon consideration of all the circumstances of the case. *Davis v. United Fruit Company*, 402 F. 2d 328 (2d Cir. 1968), cert. denied, 393 U.S. 1085, 89 S.Ct. 869, 21 L.Ed.2d 777 (1969). This discretion has been consistently upheld in this Circuit, especially since the institution of the individual assignment system. *Lamb v. Globe Seaways, Inc.*, 516 F.2d 1352 (2d Cir. 1975).

■ Ordinarily the Court will look with favor upon an application for a continuance based upon the unexpected illness of a party. However, this was not the ordinary case. This action was commenced in June of 1972 and was assigned to me together with some twenty-one other matters pending over three years, as a priority case under the District Court's Plan for the Reallocation and Disposition of Three-Year-Old Civil Cases (the "crash program"). This program, adopted by the Board of Judges of the Court on March 3, 1975 pursuant to resolutions of the Judicial Conference directing District Judges to eliminate old cases from the dockets, required all these cases, many of considerable complexity and requiring lengthy trials, to be tried or otherwise disposed of before July 11, 1975. Counsel noted their readiness for immediate trial at a pretrial conference held April 4, 1975 and were given a firm date. At the same conference all the reassigned "crash program" cases were scheduled for expedited completion of discovery where necessary,

and given trial dates through July 11, 1975. This Circuit, faced with particular problems of calendar congestion, has been especially sympathetic to the District Court's efforts in this respect. *See, e. g.,* cases cited in *Lamb v. Globe Seaways, Inc., supra.*

Moreover, in ruling on this application, the Court considered all the aspects of the case. Defendant's predicament was in large part of his own creation. Plaintiff had taken Curran's deposition, and the latter's attorney had had the opportunity at that time to preserve testimony favorable to him, had he so chosen. Curran is not a young man, and in requesting an indefinite continuance counsel gave no assurance that, even had it been possible for the Court to accommodate him by rescheduling the trial for a later date, he would have been able to attend. *See Scholl v. Felmont Oil Corp.*, 327 F.2d 697 (6th Cir. 1964). Plaintiff, too, deserves his day in court. Furthermore, at no time did counsel make an offer of proof concerning what material testimony, prejudicial by its absence, Curran might give in person.

Even now, after trial, upon review of the evidence as a whole, the Court remains of the view that Curran was not deprived of substantial justice by the denial of a continuance under the circumstances. Indeed, inasmuch as plaintiff had the burden of proof, the Court cannot assume that Curran's absence was more prejudicial to him than to plaintiff. Accordingly, the Court declines to order a new trial on this ground.

■ As a further basis for setting aside the award of punitive damages, defendants claim that the jury was not properly instructed on the degree of malice required to support such an award. The Court notes that defendants submitted no requests to charge on this issue, and after the Court's charge made no specific objections to its instructions in this respect, nor any requests to modify or supplement the charge. Furthermore, defendants did not object when the Court outlined the special verdict

form including two questions concerning punitive damages, which it intended to submit to the jury. Nevertheless, if clear injustice would result from an error in the Court's charge, the verdict remains subject to review on this ground. 6 A. Moore's Federal Practice ¶ 59.08[2] (1972). There was, however, no such error in the charge. Punitive damages may be awarded for violations of the Landrum-Griffin Act upon a showing of malice or reckless indifference to plaintiff's rights. *International Brotherhood of Boilermakers, etc. v. Braswell,* 388 F.2d 193 (5th Cir. 1968) (Wisdom, J.) And they may likewise be awarded for malicious prosecution if defendants acted in reckless disregard of plaintiff's rights. 2 PJI 810. The jury was properly instructed that a finding of malice sufficient to find liability for malicious prosecution would not necessarily justify an award of punitive damages, but that such an award should reflect the jury's judgment of a particular defendant's malice or recklessness. *See Reynolds v. Pegler,* 123 F.Supp. 36, 41 (S.D.N.Y. 1954), *aff'd,* 223 F.2d 429, *cert. denied,* 350 U.S. 846, 76 S.Ct. 80, 100 L.Ed. 754 (1955). Taken as a whole, the Court's instructions fairly presented to the jury the standard by which they should assess punitive damages. And the allocation which the jury made reflects a reasoned application of this standard. *Id.*

Defendants further claim, in connection with their motion for a new trial, that the issue of liability under 29 U.S.C. § 411(a)(5) was improperly submitted to the jury, because, to constitute "discipline" within the meaning of that section their actions would have had to be such as to deprive plaintiff of his Union rights, for example, membership. Causing him to be summarily arrested, taken from the Union Hall to the precinct, and booked on charges of criminal trespass and disorderly conduct, they contend, is not the "discipline" to which the Landrum-Griffin Act is addressed. However, the Landrum-Griffin Act protects the Union members right to dis-

cuss Union affairs, and whether a particular action constitutes discipline is to be determined by its practical effect, *Rekant v. Shochtay-Gasos Union, Local 446, etc.,* 205 F.Supp. 284, 289 (E.D.Pa. 1962). In the Court's view, the jury was entitled to find that the practical effect of the defendants' actions was disciplinary in nature.

In any event, since the jury's finding of a violation of plaintiff's rights under the Landrum-Griffin Act was supported by the evidence addressed to § 411(a)(2), any possible error in submitting the claim under § 411(a)(5) to the jury cannot be considered prejudicial.

Defendants also move for a new trial on the ground that the verdict was against the weight of the evidence in numerous respects. The standard by which evidence is judged on a motion for a new trial is less stringent than upon a motion for judgment notwithstanding the verdict. However, determination of that motion rests within the sound discretion of the trial court to see that there is no miscarriage of justice. 6 A. Moore's Federal Practice ¶ 59.08[5] (1972). As discussed above, there was sufficient evidence to warrant submission of the case to the jury, with an appropriate direction in view of the uncontroverted evidence that the "policy" to which the notice referred had never been officially adopted by the Union. Upon review of the probative evidence in the case, together with the inferences which the jury could reasonably have drawn therefrom, and evaluating all the testimony, the Court is persuaded that the jury's verdict was neither unsupported by the evidence, nor against "the right and justice of the case." Wright and Miller, *supra,* § 2531. This Court, too, considers the abuse of their authority by persons in positions of responsibility to be a serious matter, and places high value upon individuals' rights to dissent, to express their views, and to be free of groundless arrest. In light of the circumstances of this case, the Court

does not find the verdict a miscarriage of justice.

The court has considered the other arguments which defendants advance and finds them without merit. Accordingly, the motion for a new trial is denied; the motion to set aside the verdict is granted insofar as it relates to the award of punitive damages against the Union, and is in all other respects denied.

Plaintiff's motion to recover attorney's fees is, in the Court's discretion, denied.

It is so ordered.