James **MORRISSEY**,
Plaintiff-Appellant-Appellee,

v.

**NATIONAL MARITIME UNION OF AMERICA**,
Defendant-Appellant-Appellee,

and

Joseph **Curran et al.**,
Defendants-Appellants.

Nos. 615–617, Docket 75–7457, 75–7459 and 75–7467.

United States Court of Appeals, Second Circuit.

Argued April 7, 1976.

Decided June 24, 1976.

Arthur E. McInerney, New York City (Duer & Taylor, and John S. Chapman, Jr., New York City, of counsel), for plaintiff-appellant-appellee.

Charles Sovel, New York City (Abraham E. Freedman, New York City, of counsel), for defendant-appellant-appellee NMU.

Harold E. Kohn, Philadelphia, Pa. (Feder, Kaszovitz & Weber, New York City, of counsel), for defendant-appellant Joseph Curran.

Harold Epstein, New York City (Bloom & Epstein, New York City, of counsel), for defendant-appellant Shannon J. Wall.

Kenneth J. Finger, White Plains, N. Y., for defendant-appellant Charles Snow.

Before FRIENDLY, MANSFIELD and MULLIGAN, Circuit Judges.

FRIENDLY, Circuit Judge:

We have here a set of appeals by defendants and a limited cross-appeal by plaintiff in an action brought in the District Court for the Southern District of New York. Plaintiff Morrissey, a member of defendant National Maritime Union of America (NMU or the Union), obtained a modest award of compensatory damages and a large award of punitive damages against the Union and three individual defendants. The complaint stated two claims. One charged violations of § 101(a)(2) and (5) of the Landrum-Griffin Act, 29 U.S.C. § 411(a)(2) and (5). The other was a pendent claim for malicious prosecution. The individual defendants were Joseph Curran, president of the Union; Shannon J. Wall, its secretary-treasurer; and Charles Snow, its chief security officer; claims against three other defendants were dismissed during trial with plaintiff's concurrence. The case was tried before Judge Ward and a jury.

The nature of the case and the proceedings in the trial court are well described in Judge Ward's post-trial opinion, 397 F.Supp. 659, 663–64 (1975):

On July 1, 1971, Morrissey who had for years opposed the established Union leadership, was in the Union Hall in New York City, distributing pamphlets contesting Curran's policies as he had on several occasions during the preceding month. Curran was President of the Union, but on that day was in Boca Raton, Florida. The Master-at-Arms, James Nimmo, upon instructions from Snow, the Chief of Security, several times requested Morrissey to cease distributing pamphlets inside the Hall, pointing out to him a notice posted on the bulletin board in the Hall and advising him that his conduct was illegal. The notice, which was undated but was signed by Wall, then the Union's Secretary-Treasurer, read:

It is the established policy of the National Maritime Union that only official union publications may be distributed inside the Hiring Halls or other union offices. No solicitation is permitted inside any union buildings. Any persons attempting to solicit sales or distribute unauthorized literature inside NMU buildings will be asked to discontinue such practice and, in the event they fail to comply with such request, will be required to leave the premises.

When Morrissey persisted in distributing his pamphlets and refused to leave the building, the police were called, as Snow had directed. After a brief meeting with Snow in his office, the police took Morrissey to the Sixth Precinct Station House, where, upon a complaint which Nimmo signed, he was charged with disorderly conduct and criminal trespass. Morrissey was allowed to leave within a short time but was summoned for arraignment July 13, 1971. At the arraignment the charge of disorderly conduct was dropped and the case set for trial on July 20, 1971. The trial judge, after a preliminary hearing at which no testimony was taken, summarily dismissed the charge of criminal trespass, finding no chargeable offense upon any set of facts which the State offered to prove. Counsel for the Union was present at that time.

Morrissey, in this civil action brought pursuant to 29 U.S.C. § 412, claimed that the actions of the Union officials in prohibiting and preventing him from distributing the pamphlets in the Union Hall deprived him of his right under 29 U.S.C. § 411(a)(2) to meet and assemble freely with other Union members and to express his views, arguments and opinions; that their causing his arrest constituted improper disciplinary action in violation of 29 U.S.C. § 411(a)(5); and that the arrest and subsequent attempts to prosecute him constituted the common law tort of malicious prosecution. He sued for both compensatory and punitive damages.

The Court, using a special verdict form, submitted the question of liability and compensatory and punitive damages on the Landrum-Griffin Act claims and the malicious prosecution claim separately to the jury.

The jury returned a verdict as follows:

| | |
|---|---|
| Landrum-Griffin Act: Compensatory damages: | $500 |
| Punitive Damages against the Union: | $50,000 |
| against Curran: | $100,000 |
| against Wall: | $60,000 |
| against Snow: | $10,000 |
| Malicious Prosecution: Compensatory damages: | $3,000 |
| Punitive Damages against the Union: | $50,000 |
| against Curran: | $25,000 |
| against Wall: | $15,000 |
| against Snow: | $20,000 |

The judge refused to disturb this except by eliminating the award of punitive damages against the Union, 397 F.Supp. at 666–67, and also refused to grant a new trial.

We are confronted with a barrage of assaults by the defendants, some relating only to the Landrum-Griffin (LG) claim, some relating only to the malicious prosecution claim, and some relating to both. Plaintiff cross appeals from the judge's elimination of the punitive damage award against the Union. Since we have concluded that one of the defendants' points requires reversal of the judgment on the LG count for a new trial, we find it convenient to deal in the first instance with those challenges which go only to that claim and to discuss all other points in connection with the malicious prosecution claim.

## I. *The Landrum-Griffin Claim*

Two sections of the Landrum-Griffin Act are here relevant. Section 101(a)(2) reads as follows:

Freedom of speech and assembly.—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

Section 101(a)(5) reads:

Safeguards against improper disciplinary action.—No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

Having charged the language of § 101(a)(2) in full, the judge continued:

The law gives a union the right to make reasonable rules.

I charge you as a matter of law that on July 1, 1971, the notice against distributing unauthorized literature in the union hall which had been posted earlier was not at that time, that is, on July 1, 1971, duly promulgated by the union.

If you find that on July 1, 1971 plaintiff's activities created an immediate danger of seriously interfering with the union's function, you may find that prohibiting those activities was reasonable.

The defendants objected that this charge denied them their rights under the "proviso" to § 101(a)(2). As we understand the argument, there are really two claims: that the judge was wrong in ruling that the notice was not "duly promulgated"; and that in so doing he effectively required the defendants to show the reasonableness of their actions on July 1, 1971 rather than to show only the reasonableness of the overall policy.

■ We think this charge was correct. In his post-trial opinion, after reciting Wall's testimony that he had signed the notice and caused it to be posted at Snow's request because passing out literature tended to stimulate arguments, and Snow's deposition testimony that arguments sometimes became fights, Judge Ward said, 397 F.Supp. at 664–65:

Whether this would be a reasonable basis for adopting a standing rule might have been a question for the jury. How-

ever, the Union Constitution, in evidence, clearly states that all policies of the Union and all changes in official Union policy, must be formally approved by the members of the Union. And the transcript of the proceeding before Judge Ringel in New York Criminal Court on July 20, 1971, also in evidence in this action, at which the charge of criminal trespass was dismissed, contains statements made by attorneys for the Union, that the notice in question was never so ratified. The notice itself purports to reflect a national policy. There is no evidence whatever in the record that the "policy" referred to in the notice was ever adopted by the Union membership. Accordingly, the Court instructed the jury, on this issue alone, that the notice itself was not duly promulgated by the Union.

We agree with this. We add only that even if there were error in construing the Union's constitution, as defendants contend, we would reach the same ultimate result. The Congress which thought it important to decree rights of freedom of speech and assembly for union members could hardly have intended the proviso to mean that a single union officer, simply by placing a notice, even a "reasonable" notice, in a particular hiring hall could limit those rights; the proviso permitted that to be done only by reasonable rules adopted by the "labor organization" itself. Whatever might be sufficient to count as action of a "labor organization," this was not enough.

■ We find equally little merit in the argument that only the Union can be liable for a violation of § 101(a)(2). The civil remedy for a violation of Title I rights is provided in § 102. Nothing in its language indicates that only a labor organization may be sued and the second sentence, which specifies a venue provision for "[a]ny such action against a labor organization", implicitly recognizes that suits may be brought against others. The few cases on the point have held that § 102 extends to suits against individual defendants, at least if it is shown that they were acting under color of union authority. *Vincent v. Plumbers &*

*Steamfitters Local No. 198,* 384 F.Supp. 1379, 1384 (M.D.La.1974); *Eisman v. Baltimore Regional Joint Bd. of Amal. Clothing Wkrs.,* 352 F.Supp. 429, 437 (D.Md.1972), aff'd, 496 F.2d 1313 (4 Cir. 1974); *Talavera v. International Bro. of Teamsters,* 351 F.Supp. 155 (N.D.Cal.1972). Given the Act's intent to curb the power of overweening union officials, this is clearly the right result.

■ Defendants also argue that union officials should have a defense to suits claiming violations of § 101 if they have acted within the scope of their authority, see *White v. King,* 319 F.Supp. 122, 126 (E.D.La.1970), and *Nix v. Fulton Lodge No. 2,* 262 F.Supp. 1000, 1008 (N.D.Ga.1967), affirmed in part, vacated in part, 415 F.2d 212 (5 Cir. 1969). Plaintiff persuasively responds that such an exception cannot extend to acts of union officials who are abusing their positions, see *Eisman, supra,* 352 F.Supp. at 437, as the jury, by its award of punitive damages, necessarily found. In any event the judge was not asked to charge on this point and no exception was taken to his failure to do so.

■ We also disagree with the contention that punitive damages cannot be assessed for a violation of Title I of the Landrum-Griffin Act. Section 102 authorizes the bringing of civil actions "for such relief (including injunctions) as may be appropriate." The availability of punitive damages under this section is an open question in this circuit, upon which the district courts have divided. *Farowitz v. Associated Musicians of Greater N. Y.,* 241 F.Supp. 895, 909 (S.D.N.Y.1965), and *Sands v. Abelli,* 290 F.Supp. 677, 684–85 (S.D.N.Y.1968) held that such damages could be awarded; although *Sands* was decided pursuant to a remand from this court for, *inter alia,* the assessment of damages, nothing was said on this issue, see *Salzhandler v. Caputo,* 316 F.2d 445, 451 (2 Cir.), cert. denied, 375 U.S. 946, 84 S.Ct. 344, 11 L.Ed.2d 275 (1963). *Cole v. Hall,* 35 F.R.D. 4, 8 (E.D.N.Y.1964), held on a preliminary motion that § 102 did not allow for punitive damages; however,

by the time later proceedings in the case were appealed to this court apparently no question of punitive damages was argued, and certainly none was decided, see 462 F.2d 777 (2 Cir. 1972). The subsequent Supreme Court opinion, *Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), likewise did not address the issue, see 412 U.S. at 3–4 & n. 3, 93 S.Ct. 1943, although the Court's holding that in appropriate circumstances attorneys' fees can be recovered in a § 102 suit was based in part on the premise that § 102 was "cast as a broad mandate to the courts," 412 U.S. at 11, 93 S.Ct. at 1949, and is thus, at the least, not hostile to the award of punitive damages. The Fifth Circuit has held in a § 102 suit, *International Bhd. of Boilermakers v. Braswell,* 388 F.2d 193, 199–200 (5 Cir.), *cert. denied,* 391 U.S. 935, 88 S.Ct. 1848, 20 L.Ed.2d 854 (1968) (Wisdom, J.), where a plaintiff sought damages for wrongful expulsion from a union, that punitive damages for "malice or wanton indifference" can be assessed, substantially what the jury was charged here. We agree with that decision.[1]

■ Although, as will appear later in this opinion, we agree with the court below that under applicable New York law the Union cannot be held for punitive damages for malicious prosecution, and indeed believe that the judge should have extended that ruling to compensatory damages for malicious prosecution as well, we see no justification for his ruling as a matter of law that the Union could not be held for punitive damages under the Landrum-Griffin Act. Section 102 is proof enough that Congress intended that labor organizations could be civilly liable for violating § 101. If punitive damages can be awarded against other defendants, they can be awarded against unions as well. In *Sands v. Abelli, supra,* punitive damages were awarded against both a local and its president; in *International Bhd. of Boilermakers v. Braswell, supra,* they were awarded solely against a union. As these cases show, there is no need to demonstrate that the membership authorized or ratified the acts giving rise to punitive damages. Rather, the test is the "complicity rule", followed by federal courts in pre-*Erie* days—that punitive damages may be imposed upon a corporation when superior officers order, participate in, or ratify, outrageous conduct, *Lake Shore & Michigan Southern Ry. v. Prentice,* 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1893).

Despite our disagreement with appellants on all of these points, we are constrained to reverse the judgment on the LG count for the reason now to be discussed. As stated, plaintiff claimed violations not only of § 101(a)(2) but also of § 101(a)(5). After reading the latter section to the jury, the judge charged:

> If you find that any defendant's action in causing Mr. Morrissey to be removed from the union hall was "discipline" and restricted or inhibited his rights as a member of the union, you may also find for plaintiff on his first cause of action.
>
> If you find that defendants, or any of them, violated either of these two sections of the Landrum-Griffin Act, you will find for plaintiff on his first cause of action.

After the charge, defense counsel objected "that this case has no applicability to that section. It is not a suspension or an infringement as contemplated by the Landrum-Griffin Act." The court overruled the objection and later developed its reasoning in its post-trial opinion, 397 F.Supp. at 669.

■ The question whether the undisputed acts of having Morrissey, in the judge's words, "summarily arrested, taken from the Union Hall to the precinct, and booked on charges of criminal trespass and disorderly conduct," *id.,* come within the phrase "or otherwise disciplined" in § 101(a)(5) was a question of law to be decided by the judge,

---

1. The discussion of *Braswell* in *International Bhd. of Boilermakers v. Hardeman,* 401 U.S. 233, 241–45, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971), a case arising from the same factual situation, in no way criticizes *Braswell* on the point here relied on; nor is there any indication that the Court was in essence disapproving the opinion generally, as is shown by the positive citation of *Braswell* elsewhere in the opinion, 401 U.S. at 246, n. 14, 91 S.Ct. 609.

not an issue to be passed on to the jury. We would not, of course, reverse on that ground if the conduct were within the statutory language. But it is not.

"Discipline" is a word of many meanings. A common one is punishment, particularly by persons in authority, although the word is less appropriate to describe an arrest, or even a prosecution, with no resulting sanction. In any event, common usage does not settle the meaning of "otherwise disciplined" in § 101(a)(5). The term must include something more than the usual forms of union discipline—fines, suspensions, or expulsions—which are expressly mentioned, but there is a paucity of authority on just what the term does include. We have held that it extends as far as "blacklisting" or certain other union actions that interfere with a worker's employment opportunities. *Detroy v. Am. Guild of Variety Artists,* 286 F.2d 75 (2 Cir.), *cert. denied,* 366 U.S. 929, 81 S.Ct. 1650, 6 L.Ed.2d 388 (1961); *Figueroa v. NMU,* 342 F.2d 400 (2 Cir. 1965). Cases decided in other circuits—e. g., *Duncan v. Peninsula Shipbuilders Ass'n,* 394 F.2d 237 (4 Cir. 1968); *Williams v. International Typographical Union,* 423 F.2d 1295 (10 Cir.), *cert. denied,* 400 U.S. 824, 91 S.Ct. 47, 27 L.Ed.2d 53 (1970)—do not get us any further. Judge Ward relied on *Rekant v. Shochtay-Gasos Union,* 205 F.Supp. 284, 288–89 (E.D.Pa.1962), which held that the withdrawal of a prior resolution to share work with an unemployed union member was "discipline," regardless of whether there was an original "right" to have the work shared. Whatever the force of that case in light of its later reversal, on somewhat different grounds, 320 F.2d 271 (3 Cir. 1963), it was still a job-opportunities case.

The scope of the prohibition is best illumined by Congress' statement of the conditions that will overcome it. Congress desired to provide "safeguards against improper disciplinary action," not to outlaw union discipline. A union may "otherwise discipline" a member, just as it may fine, suspend or expel him, if it has served him with written specific charges, has given him a reasonable time to prepare his defenses, and has afforded him a full and fair hearing. At least in this context, the phrase "otherwise disciplined" must be limited to types of punishment where compliance with these conditions is feasible. The compulsory steps would take weeks, even months. The "otherwise disciplined" phrase could thus not have been meant to cover a decision to call a policeman to remove a member from a union's premises.

■ We do not say, of course, that "discipline" may not be involved in union sanctions arising from incidents that would otherwise be violations of law, cf. *International Bhd. of Boilermakers v. Hardeman,* 401 U.S. 233, 91 S.Ct. 609, 28 L.Ed.2d 10 (1971) (expulsion following assault on union official). We do say that Congress could not have been thinking of a case like this where the union chooses to invoke the processes of law and the arrested union member will have his full range of procedural protections in the courts. If the decision to have him arrested and prosecuted is itself unjustified, he will have other legal remedies, as this case demonstrates; Title I has no preemptive effect on such remedies, § 103. We thus conclude it was error for the judge to have allowed the jury to find the defendants liable for violating § 101(a)(5).[2]

A closer question is whether the error can be disregarded as harmless since the evidence would have justified a verdict against the defendants under § 101(a)(2)—an alternative basis for refusing to disturb the verdict which the district judge himself propounded, 397 F.Supp. at 669.

■ The general rule is that when one of the two claims that have been submitted to the jury should not have been submitted, a general verdict, such as was rendered here on the LG claims, cannot stand. *United*

2. Given our conclusion, there is no need to pass on appellant Snow's contention that the reference in § 101(a)(5) to "by such organization or by an officer thereof" operates to exclude him from its coverage. Similarly, there is no reason to address the contention, made by appellants generally, that submission to the jury of the § 101(a)(5) theory along with the malicious prosecution claim allowed two recoveries for the same injury.

*New York and New Jersey Sandy Hook Pilot Ass'n v. Halecki,* 358 U.S. 613, 619, 79 S.Ct. 517, 520, 3 L.Ed.2d 541 (1959); *Patton v. Wells,* 121 F. 337, 340 (8 Cir. 1903); *Travelers' Ins. Co. v. Wilkes,* 76 F.2d 701, 705 (5 Cir.), *cert. denied sub nom. Hirsig v. Travelers' Ins. Co.,* 296 U.S. 604, 56 S.Ct. 120, 80 L.Ed. 428 (1935); *Fatovic v. Nederlandsch-Ameridaansche Stoomvaart,* 275 F.2d 188, 190 (2 Cir. 1960); *Albergo v. Reading Co.,* 372 F.2d 83, 86 (3 Cir. 1966), *cert. denied,* 386 U.S. 983, 87 S.Ct. 1284, 18 L.Ed.2d 232 (1967). The language used is generally quite absolute ("a new trial will be required, for there is no way to know that the invalid claim . . . was not the sole basis for the verdict"—*Halecki;* "[s]ince we cannot determine from the general verdict . . . whether they relied upon a proper or improper claim . . . we must reverse the judgment and order a new trial"—*Fatovic* ). However, a few recent cases have disregarded the error when the appellate court was fairly convinced that the jury proceeded only on the sound ground. In *Collum v. Butler,* 421 F.2d 1257 (7 Cir. 1970), a § 1983 action for police brutality, the trial court charged that recovery might be had if the police had beaten the plaintiff or had kept him from contacting counsel or family. The court of appeals held that § 1983 would not cover the latter point, in the absence of unusual circumstances not there shown, but that plaintiff's judgment should be affirmed. The dominant issue at trial had been the physical abuse, and that was the only issue on which damages had been proven; the other issues had been of "such relative insignificance" that the result "would not have been substantially affected if these issues had not been submitted," 421 F.2d at 1260. *Gardner v. General Motors Corp.,* 507 F.2d 525, 529 (10 Cir. 1974), is to much the same effect. See also *Roginsky v. Richardson-Merrell, Inc.,* 378 F.2d 832, 837–38 (2 Cir. 1967).

▮ Assuming these cases to have been soundly decided, we think the qualification on the general rule of *Halecki* and other cases must be kept within rather strict bounds. Here we find no sufficient basis

for confidence that the verdict on the LG count would have been rendered, and particularly that the same verdict would have been rendered, if the complaint under § 101(a)(5) had not been submitted. The opening statement of plaintiff's counsel separately discussed denial of free speech and of procedural rights, and indicated to the jury that failure to accord procedural rights was itself a ground of recovery. In examining Morrissey on redirect, counsel asked specific questions to bring out that Morrissey had not been given written charges, a chance to defend, or a hearing, before the police were summoned. In summation, he made a point of calling the jury's attention to Morrissey's testimony in this regard. The judge read § 101(a)(5) to the jury as well as § 101(a)(2) and, as we have seen, specifically instructed that the jury could find for plaintiff if it concluded that defendants had "violated either of these two sections of the Landrum-Griffin Act." Finally, during the jury's deliberations, the § 101(a)(5) charge was re-read to it; then stricken when the court decided the note had asked for something else; then read once more after the jury asked to hear certain parts of the LG charge again. The jury was thus repeatedly invited to find for the plaintiff under either section of the Landrum-Griffin Act. While it may be tempting to say that the jury could not really have thought that Morrissey was entitled to a hearing before the police were called, they had been told they could base their verdict on just that. As a practical matter, judging from the large amount of punitive damages awarded, we would guess that the jury sustained both theories of recovery. The error thus was not harmless.

## II. *Malicious Prosecution*

### A. *The Charge.*

Appellants claim that the charge to the jury was erroneous in several respects.

Stanley Gruber, called as a witness by the defendants, testified he was an attorney whose firm (that of Abraham E. Freedman) represented NMU; his office was in the

same building as the hiring hall. On July 1, 1971 Snow told Gruber that Morrissey was distributing literature "downstairs in the hiring hall" and had refused to stop doing this after several requests. Gruber advised Snow that he should repeat the requests; that if Morrissey did not comply, he should call the police; and that if Morrissey refused to stop after the police had arrived, Snow should have him arrested.[3]

The court charged:

> Defendants claim that before starting the prosecution against plaintiff attorneys were consulted. As I have told you, you may not consider that fact, if you find it to be a fact, on the issue of probable cause. But if you find that a defendant consulted an attorney before starting or furthering the prosecution, that he stated to that attorney all of the pertinent facts then known to him or which he then believed to be true and that the attorney advised him that those facts constituted offenses, you may consider those facts as tending to negate malice.

Although no instruction on the point was submitted nor objection made by the counsel who represented all four appellants at trial, appellate counsel now argue that the second sentence of the instruction was an error.

Prosser on Torts § 119 at 843 (1971 ed.) refers to "the almost universal holding that probable cause is established where the prosecution was instituted with the advice of counsel." The extent to which New York adopts this view—or the view of the trial judge—is a matter not free from doubt; cases pointing in both directions, and in between, are briefly reviewed in the margin.[4] We see little profit in an attempt to reconcile these cases, or to determine which truly represents the law of the state. Even assuming that the judge was wrong in telling the jury that it could not even consider Gruber's advice on the issue of probable cause, we see no reason for invoking the plain error rule to overturn the verdict. This is not at all a case "where it is apparent to the appellate court on the face of the record that a miscarriage of justice may occur because counsel has not properly protected his client by timely objection," *Shokuwan Shimabukuro v. Higeyoshi Nagayama,* 78 U.S.App.D.C. 271, 140 F.2d 13, 15 (D.C.Cir.), *cert. denied,* 322 U.S. 755, 64 S.Ct. 1270, 88 L.Ed. 1584 (1944), or one where opposing counsel had prevailed as a result of tactics deliberately designed to prejudice the jury, *N. Y. Central R. R. v. Johnson,* 279 U.S. 310, 49 S.Ct. 300, 73 L.Ed. 706 (1929); *San Antonio v. Timko,* 368 F.2d

---

**3.** There was also evidence, discussed *infra*, that Charles Sovel, another member of the firm, had on May 27 told Morrissey, in Snow's presence, that distribution of literature within the hall was a violation of state law. However, no attempt was made to have Morrissey arrested at that time, and this can hardly be considered as Sovel giving Snow legal advice.

**4.** As early as *Hall v. Suydam,* 6 Barb. 83, 88 (Sup.Ct.1894), it was stated that "[i]f a party lays the facts of his case fully and fairly before counsel, and acts in good faith, upon the opinion given him by such counsel, (however erroneous that opinion may be), it is sufficient evidence of a probable cause, and is a good defence to an action for a malicious prosecution." *Weidlich v. Weidlich,* 177 Misc. 246, 252, 30 N.Y.S.2d 326, 332 (Sup.Ct.1941) indicates that this may still be the law of the state, as does *Hopkinson v. Lehigh Valley R. R.,* 249 N.Y. 296, 300–01, 164 N.E. 104, 106 (1928), although the latter may be limited to taking the advice of a public prosecutor.

*Godfrey v. Medical Society of The County of New York,* 177 A.D. 684, 696, 164 N.Y.S. 846, 855 (2d Dept. 1917), stated the point more moderately, to the effect that advice of counsel was competent evidence "both on the issue of want of probable cause and upon that of malice"; *Rawson v. Leggett,* 184 N.Y. 504, 512, 77 N.E. 662, 665 (1906), also indicates that advice of counsel is one of a series of facts germane to negating the absence of probable cause.

At the other end of the continuum, *Hazzard v. Flury,* 120 N.Y. 223, 227, 24 N.E. 194, 195 (1890), stated that advice of counsel "while proper upon the question of malice, does not form the basis for a finding of fact that [defendant] had probable cause . . .." Probable cause may be founded on misinformation as to the facts, but not as to the law." Subsequent cases embracing this rule, perhaps with some modification, include *Parr v. Loder,* 97 A.D. 218, 221–22, 89 N.Y.S. 823, 826 (2d Dept. 1904); *Murphy v. Eidlitz,* 121 A.D. 224, 225, 105 N.Y.S. 674, 675 (2d Dept. 1907); and *Rothschild v. Bierman,* 167 Misc. 570, 572, 4 N.Y.S.2d 431, 433 (Sup.Ct.1938).

983, 986 (2 Cir. 1966). Although the jury was told it could consider the advice of counsel as negating malice, it declined to do so; very likely it would have done the same if it had been told to consider Gruber's statement on the issue of probable cause—a charge that could not be branded as incorrect under New York law, see fn. 4.

 Moreover, the positive purposes protected by Rule 51 would have been well served in this case had counsel proposed an alternative instruction or distinctly objected to the one that was given. The purpose of the requirement is "to inform the trial judge of possible errors so that he may have an opportunity to reconsider his rulings and, if necessary, correct them," *Sweeney v. United Feature Syndicate, Inc.,* 129 F.2d 904, 906 (2 Cir. 1942). Given the dubieties of New York law on this subject, the judge was entitled to an informed discussion by counsel; there is scant equity in appellants' now complaining of his error—if error there was.

The court also charged:

If you find that a defendant did not have probable cause for believing plaintiff guilty at the time he initiated or furthered the prosecution, you may, though you're not required to, infer from that fact alone that that particular defendant acted maliciously.

Here again no objection was made, and as to this instruction there clearly was no basis for one. As said in Prosser, Torts § 119 at 848–49 (footnotes omitted):

The plaintiff must establish malice in addition to the absence of probable cause; but, since there can be no legitimate purpose in a prosecution unless there is an honest belief in the guilt of the accused, it is generally agreed that the lack of probable cause may give rise to an inference of malice, sufficient to carry the question to the jury.

Accord, e. g., *Halsey v. The New York Society for the Suppression of Vice,* 234 N.Y. 1, 7, 136 N.E. 219, 221 (1922). As to appellants' further contention that this charge was infected by the alleged error first considered, what has already been said

is a sufficient answer. Finally, defendants complain that the court did not charge that advice of counsel could be taken into account with respect to the award of punitive damages. The court was not asked to do so.

### B. *Sufficiency of the Evidence as to Curran and Wall.*

Both Curran and Wall contest the sufficiency of the evidence on the ground that there was no direct evidence of their affirmative participation in the arrest or prosecution. In passing upon this contention, the events of July 1–20 should not be viewed without reference to what had gone before. Morrissey, Curran and Wall were no strangers. In 1966 Morrissey unsuccessfully ran for secretary-treasurer of the Union in opposition to Wall, who was running on Curran's slate. Morrissey contended there were numerous irregularities in the election and, after exhausting intra-union remedies, complained to the Department of Labor. He, with some associates, also undertook the publication of a magazine entitled "The Call for NMU Democracy", attacking Curran's alleged autocratic domination of the NMU. Later the United States brought suit to invalidate the 1966 election. The suit was filed while Morrissey was at sea; when he returned, he tendered his dues to the NMU "patrolman" but the tender was refused as untimely, and he had to surrender his union book. Ultimately the 1966 election was overturned, Morrissey having been a witness for the government; he got his union book back as a result of the intercession of an Assistant U.S. Attorney. When the election was re-run in 1969, Morrissey was once again an unsuccessful opponent to Wall. Meanwhile, in February, 1969, Morrissey and others had brought a suit against Curran, Wall and others relating to the use being made of the Union pension fund; in this Morrissey was largely successful, *Morrissey v. Curran,* 423 F.2d 393 (2 Cir.), *cert. denied,* 399 U.S. 928, 90 S.Ct. 2245, 26 L.Ed.2d 796; 400 U.S. 826, 91 S.Ct. 52, 27 L.Ed.2d 56 (1970); see also *Morrissey v. Curran,* 483 F.2d 480 (2 Cir. 1973), *cert. denied,* 414 U.S. 1128, 94 S.Ct.

865, 38 L.Ed.2d 752 (1974). In light of all this, defendants' opening statement to the jury—"We are not telling you that the administration and Jim Morrissey had any love between them"—was more understatement than concession.

Likewise, the July 1971 episode was not the first of its kind. On May 14, 1971 Morrissey began passing out "The Call" in the Union Hall and the staff offices; he did this several times more before July 1. On May 27 he was told by the master-at-arms to stop distributing the literature. He then saw the master-at-arms make a telephone call; a few minutes later several officials arrived, including Mr. Sovel, who was one of the NMU's lawyers, Snow, and three or four masters-at-arms. Sovel warned him that he was in violation of the posted Union policy. Morrissey replied that the "policy" was never adopted by the membership and that, if it were a valid policy, he could be brought up on charges. Sovel then warned Morrissey he was violating a state law; Morrissey answered that if he were doing that, they could call the police and have him arrested.

We do not need to rely on inference, however reasonable, that these episodes came to the attention of higher union officials. Snow testified by deposition that, before July 1, 1971, he and others had discussed Morrissey's activities with Curran. As Snow said, "[g]enerally speaking, the conversations had to do with his handing out literature in the hall and the usual argument that ensued and it was a problem to me security-wise." Curran claimed in his deposition testimony that he first learned of the arrest "a few days" after it happened; however, Wall said that he [Wall] may have learned of it the day immediately after the arrest, and that he was told, at that time, that the president of the union was "aware of the situation." Curran testified on deposition that he learned of the arrest from several people, including the port agent and Snow. Far from being concerned, Curran told the port agent that Morrissey had no special rights, "he was no special person." A "few days after it happened," Curran had

a conversation with Sovel, one of the union's counsel, about the matter, and apparently had another talk with its senior counsel, Freedman, at about the same time. Curran claimed that he never inquired what the charges against Morrissey were—a claim which can point in several directions; he admitted that he never asked that they be dropped. Wall testified that he, too, made no effort to have the charges withdrawn. When one of the charges was dismissed on July 13, Wall, at least, was rapidly notified. On July 20, at the preliminary hearing, the prosecutor, Fishman, spoke with both Nimmo (the complainant master-at-arms) and Sovel prior to presenting his case. Sovel, indeed, made an appearance in those proceedings, and participated to the extent of trying to explain—one might say defend—the procedure by which the notice was promulgated. Finally, "right after it happened" Curran was notified that the charges had been finally dismissed; Wall, too, apparently received reports. Although Curran was not sure who had notified him—perhaps the port agent—he had a conversation with Wall about it the next day. "[W]e just discussed back and forth what happened in court."

 In light of all this we find the argument of lack of evidence to show that Morrissey's arrest and the filing of charges against him was anything other than the work of Snow, the Chief of Security, and Nimmo, who happened to be the Master-at-Arms on hand on July 1, to be lacking in reality. Sovel, one of the Union's chief counsel, who had represented Curran and Wall as well as other defendants in Morrissey's action with respect to the pension plan, had personally participated in the altercation on May 27. The jury could reasonable infer, especially with the assist from Snow's testimony about his pre-July 1 talks with Curran, that the high command of the Union had resolved to take Morrissey up on his challenge. The arrest was reported to Curran and Wall shortly after it had been made; both admittedly did nothing to have the charges withdrawn. If the evi-

dence was sufficient to justify the jury in finding Curran to have been implicated in pressing the charges, as it clearly was, that itself would have gone a fair way toward justifying a similar finding as to Wall. It is unlikely in the last degree that Curran should have been in on the plan but that Wall, his trusted lieutenant, the man who had signed the notice that gave rise to Morrissey's arrest, should not have been. Beyond this Wall took the stand and this may be an appropriate case for applying Judge Learned Hand's famous remarks in *Dyer v. MacDougall,* 201 F.2d 265, 268–69 (2 Cir. 1952), that the jury, which heard and saw him, could have believed, on the basis of demeanor, that instead of having heard nothing until after the event, as he testified, he had in fact heard it before. While that alone would not suffice, as Judge Hand held, it can tip the scales where other evidence exists.

## C. *Denial of a Continuance.*

A more troubling point is appellants' contention that the court abused its discretion in denying a continuance when Curran became seriously ill shortly before the trial date, see 397 F.Supp. at 668. Although the point is of special concern to Curran, all appellants join in it on the theory that Curran's testimony might have been helpful to them.

On March 3, 1975, the judges of the Southern District adopted a "Plan for the Reallocation and Disposition of Three-Year-Old Civil Cases," with a view to having all such cases tried or otherwise disposed of by July 11, 1975.[5] This action, commenced in June, 1972, was one of 22 assigned to Judge Ward under this Program.

At a prehearing conference on Friday, April 4, 1975, the judge directed counsel, who said they were ready, to be prepared to

begin the trial on Monday, April 14. At the start of the following week, defendants' counsel endeavored to contact Mr. Curran, who was in Florida; counsel was advised that Curran had just undergone a series of medical tests and might have to have emergency surgery on April 14. On April 10, counsel advised the judge by telephone, sought an adjournment, and offered to obtain an affidavit from the treating physician. The judge said it was unnecessary to obtain such an affidavit or to advise plaintiff's counsel since the adjournment would be denied. In fact the physician's affidavit, dated April 15, 1975, was obtained, although it does not appear that this was ever shown to the judge before the end of the trial. This affidavit stated that diagnostic tests already performed indicated the need for non-elective surgery, that Mr. Curran had been admitted to Boca Raton Community Hospital on April 14, and that it was anticipated that surgery would be performed on April 16. At the opening of the trial on April 14, counsel moved for an adjournment or, in the alternative, for a severance for Curran, stating that the operation was to be for the removal of a tumor of the colon. The judge denied both requests, indicating that he would allow all of Mr. Curran's pretrial deposition, which plaintiff had taken, to be read.

We are not greatly impressed by the judge's justification that "[d]efendant's predicament was in large part of his own creation," for failing to have his testimony perpetuated and instead simply submitting to a pretrial discovery deposition by the adverse party. The only relevant matter that appears in the record is that counsel for Curran moved, in September, 1972, for an order protecting Curran from being deposed, on the ground that Curran "has recently had major surgery" and that "it is impossible to determine at this time when

---

5. This Plan was adopted pursuant to a series of resolutions of the Judicial Conference dating back to September, 1961, which declared it to be "the policy of the judiciary that every case pending three years or more and appropriate for trial be regarded as a judicial emergency."

1961 Reports of the Proceedings of the Judicial Conference of the United States 63 [Reports]. The policy was subsequently put on a more regular basis, see 1962 Reports 74–75; 1963 Reports 46–47 and 98; 1964 Reports 104; 1966 Reports 34–35.

he will be available to give deposition [sic] if at all." However, at a hearing held some two weeks later before Judge Griesa, counsel withdrew the motion since Curran had recovered in the interim. Judge Ward's opinion makes no reference to these preliminary matters and, in any case, we do not think any substantial conclusion can be drawn from them. There is thus no real showing that before April 1, 1975 Curran had any inkling that he would be unable to attend the trial. See *Latham v. Crofters, Inc.,* 492 F.2d 913, 916 (4 Cir. 1974); compare *Davis v. United Fruit Co.,* 402 F.2d 328 (2 Cir. 1968), *cert. denied,* 393 U.S. 1085, 89 S.Ct. 869, 21 L.Ed.2d 777 (1969); *Lamb v. Globe Seaways, Inc.,* 516 F.2d 1352 (2 Cir. 1975). Neither do we find much force in the judge's observation as to defense counsel's inability to give assurances that Curran ever would be able to appear. While any abdominal surgery has its dangers, especially to persons of Mr. Curran's age, counsel had expressed no fears on this score and the issue was not explored by the judge. Finally, we cannot agree that "this was not the ordinary case" because it was subject to the District Court's "crash program," if the judge intended this remark to mean that such inclusion would justify denying a continuance otherwise required in the interests of justice; the most that can properly be said is that inclusion of a case in that program imposed a particularly severe duty on counsel to see to it that the case was ready to be tried on the scheduled date.[6]

▬ Nevertheless, while we would have been happier if a continuance had been granted, we decline to reverse the judgment on the malicious prosecution count because of its denial. Our principal reason is that, as the judge said, "at no time did counsel make an offer of proof concerning what material testimony, prejudicial by its absence, Curran might give in person,"

397 F.Supp. at 668. While counsel seeks to excuse this on the basis of the judge's statement on the telephone that there was no need to supply a medical certificate or advise plaintiff's counsel since he was going to deny the continuance in any event, this did not relieve counsel of his duty to protect the record; moreover he failed to make such an offer of proof even when he pressed the point in his post-trial motion. We likewise have not been told what Curran would have said in addition to the denials in his deposition. While we do not accept the general proposition that a lawyer's failure to depose his own client, rather than have him subjected only to the opponent's discovery, is an absolute bar to a request for a continuance in the event of the client's unexpected serious illness, here the discovery deposition seems to have covered the very topics on which Curran's live testimony presumably would have been most helpful to the defense. A prime objective of Morrissey's counsel at the discovery deposition was to force Curran to admit as much knowledge of the arrest and the bringing of charges as possible; *per contra* Curran's objective was to make the utmost denial of knowledge consistent with the truth. It is hard for us to see how he could have made any stronger denial on the stand. Finally, if there were things Curran wanted to say beyond what he had said, we see no reason why emergency methods could not have been worked out for a further deposition between the time when counsel first learned of the possibility of surgery, and April 14, when Curran entered the hospital; no claim is made that Curran's medical condition during that week would have precluded such efforts.

### D. *The Ibrahim Letter.*

On July 27, 1971, Ralph Ibrahim, a member of the Union, wrote a letter to Curran demanding that the failure of the union's attempt to limit members' rights to dissemi-

---

**6.** As the Plan stated:

Nothing herein contained is intended, nor shall it be construed, to limit or impair the inherent or statutory powers of the Court or

any Judge thereof, nor to impose any limit upon the proper exercise of judicial discretion in any action or proceeding.

nate information by prosecuting Morrissey be publicized in the union paper, The Pilot. He stated: "It should be brought to the membership's attention that James Morrissey subjected himself to criminal prosecution in order to establish this principle." Defendants claim that this letter was relevant to show that Morrissey provoked the arrest, and thus to negate the malicious prosecution count and the award of punitive damages. They tried to introduce it through Ibrahim.

Ibrahim testified that he was a member of Morrissey's group within the union, and there was also some evidence to show that the letter had been typed by Mrs. Morrissey at her place of work. However, Ibrahim testified that he had not discussed the contents of the letter with Morrissey or Mrs. Morrissey before sending it. Mr. Morrissey, at the taking of his deposition, denied any knowledge of it. The trial court ruled the letter to be inadmissible apparently on the ground that there was not a sufficient foundation for linking it with Morrissey.

█ We see no error in this ruling. There was nothing to show that Ibrahim was acting as Morrissey's agent or relating anything Morrissey had said. Beyond that we do not find in the letter the significance that appellants do. We know of no rule of law that bars a claim for malicious prosecution simply because the plaintiff knew he was risking it. The letter did not say that Morrissey had somehow tricked the defendants by doing what he did. Indeed, the letter added little to Morrissey's own testimony which made clear that the May 27 incident had put him on notice that further distribution of leaflets within the hall might result in his arrest.

E. *Liability of the Union for Malicious Prosecution.*

In his opinion the judge considered a portion of the post-trial motion which raised a point not previously presented by defendants' trial counsel, namely that the Union could not be held liable under New York law as stated in *Martin v. Curran,* 303 N.Y. 276, 101 N.E.2d 683 (1951), aff'g 273 A.D. 980, 78 N.Y.S.2d 506 (2d Dept. 1948). The court granted this portion of the motion insofar as it concerned the Union's liability for punitive damages, both for malicious prosecution and under the Landrum-Griffin Act. Plaintiff appeals from that ruling; the Union appeals from the failure to set aside the compensatory damage verdicts as well. We here deal with the contentions only insofar as they concern the malicious prosecution claim; as already noted, we see no reason to doubt that a union can be subjected to both compensatory and punitive damages for a violation of the Landrum-Griffin Act.

█ In *Martin v. Curran, supra,* the New York Court of Appeals construed § 13 of the General Associations Law, which permits an action to be brought against an association in certain instances, by means of suing the president or treasurer in a representative capacity. A bare majority of the Court of Appeals, relying on earlier precedent, held that such suits, including those sounding in tort, were limited "to cases where the individual liability of every single member can be alleged and proven," 303 N.Y.2d at 282, 101 N.E.2d at 686, through participation, authorization or ratification. Nothing in the opinion distinguishes between compensatory and punitive damages. *Madden v. Atkins,* 4 N.Y.2d 283, 174 N.Y. S.2d 633, 151 N.E.2d 73 (1958), which plaintiff claims to have severely restricted *Martin v. Curran, supra,* does nothing of the sort; it simply held that decision inapplicable to a suit by a union member against a union for damages, arising from a wrongful expulsion, see 4 N.Y.2d at 294–96, 174 N.Y. S.2d at 641–42, 151 N.E.2d 73, and even in that case required some participation by the membership, 4 N.Y.2d at 297, 174 N.Y.S.2d at 643, 151 N.E.2d 73. On the malicious prosecution count we must follow the law of New York as declared by its highest court, whatever our own views might be. There is nothing in this record to show authorization or ratification of the sort re-

quired by the New York courts. The judge thus was right in exonerating the Union from punitive damages for malicious prosecution but wrong in subjecting it to compensatory damages.

### F. *Excessive Punitive Damages.*

Eliminating the Union from the assessment of punitive damages on the malicious prosecution count, these amounted to $60,000. The punitive damages under the Landrum-Griffin count aggregated $220,000. Defendants claimed both to be excessive, but the district court declined to reduce them, 397 F.Supp. at 667–68.[7]

The basic cases in this court and in the Supreme Court dealing with the power of a court of appeals to order a remittitur for excessiveness of damages are *Dagnello v. Long Island R. R.,* 289 F.2d 797 (2 Cir. 1961) (Medina, J.), and *Grunenthal v. Long Island R. R.,* 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968). Both these decisions involved awards of compensatory damages. In three cases since *Dagnello* we have seemingly assumed, without discussion, that the standard of review with respect to punitive damages is the same. *Hope v. Hearst Consolidated Pubs., Inc.,* 294 F.2d 681, 691 (2 Cir. 1961), *cert. denied,* 368 U.S. 956, 82 S.Ct. 399, 7 L.Ed.2d 388 (1962) (diversity libel action); *Diapulse Corp. of America v. Birtcher Corp.,* 362 F.2d 736, 744 (2 Cir. 1966), *cert. dismissed,* 385 U.S. 801, 87 S.Ct. 9, 17 L.Ed.2d 48 (1966) (diversity libel action); *Lanfranconi v. Tidewater Oil Co.,* 376 F.2d 91, 94–98 (2 Cir.), *cert. denied,* 389 U.S. 951, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967) (diversity action for wrongful interference with business relationships). See also Restatement of Torts 2d, § 908(d) (Tent. Draft No. 19) (1973). Prior to *Dagnello* and *Grunenthal,* this court had affirmed *Reynolds v. Pegler,* 123 F.Supp. 36, 39 (S.D.N.Y.1954), aff'd, 223 F.2d 429, 434 (2 Cir.), *cert. denied,*

350 U.S. 846, 76 S.Ct. 80, 100 L.Ed. 754 (1955), where Judge Weinfeld had said:

> In imposing the penalty of punitive damages the jury may be said to function in a quasi-judicial capacity and just what sum will vindicate the public interest and act as a deterrent upon him who has offended rests peculiarly within the discretion of the jury as the dispenser of justice. There are, of course, limits upon the jury's power; but unless the amount of the penalty is so clearly excessive as to compel the conclusion that it is the result of passion or prejudice, its award should not be disturbed.

■ Despite all this, see also *Bankers Life & Casualty Co. v. Kirtley,* 307 F.2d 418, 423 (8 Cir. 1962), but see *Gilbert v. St. Louis-San Francisco R. R.,* 514 F.2d 1277, 1280–81 (5 Cir. 1975), the writer, speaking for himself alone, believes that the trend toward extremely large punitive damage awards may require trial and even appellate courts to subject such awards to more exacting scrutiny than awards of compensatory damages. But this case does not require a decision of that question. We perceive no possible basis for disturbing the trial judge's refusal to disturb the punitive damages, reduced to $60,000 by elimination of the award against the Union, on the malicious prosecution claim. The judgment on the Landrum-Griffin claim must be reversed because of the error in the charge. On a retrial of that claim, the court, in instructing on punitive damages, should point out to the jury, if defendants so desire, the substantial amount of punitive damages already awarded on a closely allied claim. It should also ask the jury, if defendants should request, to consider whether in the face of this the defendants would be likely to repeat the kind of conduct here alleged. It could mention that this is not a case where a plaintiff suffered substantial

---

7. The court was in error insofar as it read our decision in *Roginsky v. Richardson-Merrell, Inc., supra,* 378 F.2d 832, as having reduced an award of $100,000 punitive damages in a product liability diversity case because of the probability of multiple awards. Although we did

ventilate the latter problem, our decision rested on the insufficiency of the evidence to support any award of punitive damages under the applicable New York "complicity rule," 378 F.2d at 842–51.

actual damages but is unable to prove the amount. Whether any further award of punitive damages on the LG freedom of speech claim would be excessive is an issue that can be left until it arises, if it ever does.

We have considered various other alleged errors and find the claims insubstantial.

The judgment on the Landrum-Griffin Act claims is reversed for a new trial on the § 101(a)(2) claim alone. The judgment on the malicious prosecution claim against Curran, Wall and Snow is affirmed, and the judgment against the Union for compensatory damages on that claim is reversed with instructions to dismiss that part of the complaint against it. No costs.